Filed 10/2/13 (unmodified opn. attached)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S089478 |
| v. | ) | |
| | ) | Orange County |
| HUNG THANH MAI, | ) | Super. Ct. No. 96NF 1961 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

### ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING

THE COURT:

The opinion herein, filed August 26, 2013, and appearing at 57 Cal.4th 986, is modified as follows:

1. On page 1040 of 57 Cal.4th, delete the paragraph beginning "Other evidence also supports them . . . ," the paragrpah immediately following, and footnote 22.

2. Subsequent footnotes are to be renumbered accordingly.

This modification does not affect the judgment.

The petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S089478 |
| v. | ) | |
| | ) | Orange County |
| HUNG THANH MAI, | ) | Super. Ct. No. 96NF 1961 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

Defendant Hung Thanh Mai was convicted by the court, as charged, of the first degree murder of Don Joseph Burt (Pen. Code, §§ 187, 189).[1] The court further found true, as a special circumstance, the allegation that the killing was intentional, and that defendant knew or should have known the victim was a peace officer engaged in the performance of duty. (§ 190.2, subd. (a)(7) (section 190.2(a)(7).) A penalty jury returned a death verdict. The automatic motion for modification of the verdict (§ 190.4, subd. (e)) was denied, and defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b).) We will affirm the judgment in its entirety.

---

[1] All further unlabeled statutory references are to the Penal Code.

# FACTS

## A.  Guilt and special circumstance evidence.

As to the criminal charge of first degree murder and the peace officer special circumstance allegation, defendant waived his jury trial, self-incrimination, and confrontation rights, and stipulated that the court would determine those issues from the preliminary hearing transcript.  That transcript included the following evidence.

About 8:30 p.m. on July 13, 1996, Bernice Sarthou pulled into the Pepe's Mexican Restaurant on North Placentia Avenue just south of its intersection with Nutwood Avenue in Fullerton.  The sun was still up, so she was wearing her prescription sunglasses.  She left her car and entered the restaurant, but saw it was full, so she returned to her car and got into the drive-through line.  As she did so, she saw a patrol car, with its lights flashing, stopped behind a white BMW.  A young Vietnamese male was sitting in the driver's seat of the BMW, and a uniformed officer was sitting in the patrol car.  When Sarthou looked at the BMW's driver, he leaned forward, gripped his steering wheel, and gave her a "hard stare."

As the drive-through line moved forward, Sarthou lost sight of the two cars she had seen.  She ordered her dinner, received it, and pulled into a parking area to eat.  By this time, she had removed her sunglasses and put on her regular glasses, though there was still some sun.  From her parking place, the front of the BMW was again in view, at a distance of 35 to 40 feet.  She saw the officer lean into the driver's window of the BMW.  When she looked up again, the officer and the BMW driver were standing outside that car.  They seemed to be struggling for possession of something.  Almost immediately, she heard five shots, and the officer fell.  The BMW driver then walked up to the officer and shot him in the

2

head. After doing so, defendant got into the officer's car and drove away. At the preliminary hearing, Sarthou positively identified defendant as the man who shot the officer.

Around 9:30 p.m. that evening, Douglas Kennedy, a Fullerton Police Department homicide detective, was advised of the shooting of a California Highway Patrol (CHP) officer at 2950 Nutwood Avenue in Fullerton. He responded to the scene. There he found a white 1995 BMW 525i sedan. No CHP patrol vehicle was present. Adjacent to the BMW were shell casings, a considerable amount of blood, and various personal items.[2] The latter included a police officer's "Sam Brown" belt with holster attached, a handcuff case, a pager in a leather holder, an ammunition pouch, and a BMW car key. A wallet containing identification with defendant's name and picture was found on the front floorboard of the BMW.

Officer Burt's citation book was also nearby. This indicated he had begun to write a ticket for a suspended driver's license in the name of Phu Duc Nguyen, but the ticket had not been signed by the person being cited. There was a bloody shoeprint on the citation book. Also on the ground, near the rear of the BMW, was a "CHP 180 form," which an officer fills out before impounding a vehicle. The information on the form was for the 1995 BMW. At the front of the vehicle, traveler's checks in a paper bag were discovered.

Later that night, Officer Burt's patrol car was found abandoned in the driveway of a Ford dealership located at the corner of South Loara Street and West Lincoln Avenue in Anaheim. Defendant lived close to the dealership, at 1780 West Lincoln Avenue. A witness saw an Asian male run from the dealership that

---

[2] The victim's body had been removed from the scene by the time Detective Kennedy arrived.

3

evening, jump over the bumper of a parked Honda, and proceed in the direction of defendant's residence. A shoeprint was recovered from the Honda's bumper.

Officer Burt died from multiple gunshot wounds. There were entry wounds behind his left ear, in his upper right arm, in the back of his left thigh, behind his left ankle, just above his right buttocks, and in his left buttocks. The arm wound caused the humerus bone in his right arm to fracture. The fatal bullets were the one that entered behind his left ear and exited through his right eye, and those that entered his buttocks and traveled upward through his torso into his intestines, stomach, and lungs. Gunpowder residue on the entry wound behind the victim's ear indicated this bullet had been fired at very close range.

Chang "Alex" Nguyen testified that at the time of Officer Burt's murder, Nguyen and defendant were engaged in an ongoing criminal enterprise whereby Nguyen purchased from defendant, on a weekly basis, large quantities of forged traveler's and payroll checks. On the evening of July 13, 1996, defendant telephoned Nguyen in Houston, Texas, where Nguyen lived. Defendant said he was in " 'deep shit' " because he had " 'just [taken] down a California Highway Patrolman,' " and he needed a place to " 'lay low.' " The next night, defendant flew to Dallas, where Nguyen picked him up at the airport.

During the drive from Dallas to Houston, defendant recounted that on the evening of July 13, he was pulled over by a CHP officer because his lights were off, though defendant thought they were on. Defendant believed he had an outstanding warrant, so he did not present his own driver's license to the officer, and instead "used somebody else's name" when identifying himself. That name "[came] back as [a] suspended . . . license." The officer removed defendant from his car and told defendant he would have to tow it. At this point, defendant had a "gut feeling something was going to go wrong." He suggested the officer just give him a ticket, tow the car, and tell him where to pick it up. The officer responded

4

"[f]ine," but said he had to check the trunk and do an inventory. Defendant then knew "something [was] going to happen" because he had "stuff" in the car.**3**

Defendant told Nguyen that the officer then opened the trunk, pulled out a bag, opened it, looked inside, and immediately advised defendant he was under arrest. Defendant already had two "strikes" against him, was afraid a third conviction would lead to life imprisonment, and wanted to leave no witnesses. So he drew his gun and shot the officer three times. The officer fell, but was still "twitching." Defendant did not want the officer to suffer, and wanted to make sure he left no witnesses, so he shot the officer four more times. Defendant then looked for his own car keys, but could not find them, so he took the officer's gun, got into the patrol car, and drove away. Defendant abandoned that vehicle "somewhere" and paid a "Mexican guy" $100 for a ride to a friend's house.

Shortly after arriving at Nguyen's Houston apartment, defendant said he needed to shop for new clothes, particularly new shoes, because he had gotten blood on his shoes and had not been able to clean it all off. Nguyen noticed a dark spot on the sneakers defendant was wearing.

On the way to a shopping mall after his arrival in Houston, defendant made a cell phone call, apparently to a friend, and asked whether the person called had taken care of " 'that package I left for you.' " The other person said something, and defendant then declared, " 'Well, you better because it's very important.' " After hanging up, defendant told Nguyen he had " 'something . . . important I need to have my friend get rid of,' " and wanted to " 'make sure it's been done right.' "

Two or three days after defendant's arrival in Houston, Nguyen and his lawyer contacted the Federal Bureau of Investigation (FBI), met with an agent,

---

**3** Nguyen said he and defendant used the word "stuff" when discussing the forged checks Nguyen was buying from defendant.

and told the agent of defendant's confession and location.  Defendant was arrested in Nguyen's Houston apartment by FBI agents and local law enforcement officers.

When arrested, defendant was not wearing shoes, but a pair of Kmart tennis shoes were found beneath the sofa on which he had been sleeping.  A substance resembling dried blood was observed on these shoes.  At the preliminary hearing, Nguyen identified these shoes from photographs as the ones defendant was wearing, and wanted to replace, when he arrived from California.  The sole pattern on these shoes was consistent with the bloody shoe print on Officer Burt's citation book.  A comparison between these shoes and the shoe print left on the bumper of the Honda yielded a "positive match."

Victoria Pham, defendant's girlfriend, testified she had assisted him in leasing a white BMW.  She saw him in the car between 5:00 p.m. and 6:00 p.m. on July 13, 1996.  The next day, he telephoned her and told her "something [had] happened" to the BMW, and it was hers.

No defense evidence was presented at the preliminary hearing.

### B.  Prosecution's penalty phase evidence.

A jury was sworn to determine the issue of penalty.  As a factor in aggravation, the prosecution presented extensive evidence about the factual circumstances of Officer Burt's murder, and about its impact on surviving victims. (§ 190.3, factor (a).)  Also presented in aggravation was evidence of other crimes by defendant involving violence or the threat of violence.  (*Id.*, factor (b).) Finally, the prosecution introduced evidence that defendant had sustained several prior felony convictions.  (*Id.*, factor (c).)

## 1. *Facts of the capital crime.*

The evidence on this subject was consistent with the prosecution's showing at the preliminary hearing, but included several additional witnesses and certain additional details.

Fullerton Reserve Police Officer Michael Lyman testified that between 8:00 p.m. and 8:20 p.m. on July 13, 1996, he was driving through the intersection of Nutwood and Placentia Avenues when he noticed a CHP car, with its lights flashing, parked behind a white BMW. The CHP officer, who was writing the BMW driver a ticket, gave Lyman a "Code 4" signal, meaning everything was all right and no assistance was needed. Though Lyman first tentatively identified another man as the BMW's driver, he later positively identified defendant from a photo lineup.

Around 8:30 p.m. on July 13, 1996, Benjamin Baldauf was preparing to enter and register at a hotel near the intersection of Placentia and Nutwood. He noticed a CHP vehicle making a traffic stop of a white BMW. Baldauf described the lighting at this time as "long on shadows, just before dark." As Baldauf entered the hotel, the CHP officer appeared to be examining the trunk of the BMW.

After registering at the hotel, Baldauf and his daughter walked toward the Pepe's Restaurant on Placentia. The officer was still sorting through the BMW's trunk, but seemed relaxed. However, the BMW driver appeared nervous; his eyes were "darting . . . wildly." This bothered Baldauf, so he looked back toward the stopped vehicles as he proceeded on toward the restaurant. Baldauf saw the officer approach the driver's door of the BMW, at which point "[t]he [BMW] driver came out shooting." Baldauf counted at least five shots in rapid succession. The BMW driver and the officer struggled and fell together; the shooter appeared to take something from the officer, then stood up and shot him in the neck or head

7

at close range. Baldauf remembered seeing some traveler's checks on the ground near the officer, which "didn't make sense." In court, Baldauf positively identified defendant as the shooter.

Bernice Sarthou testified, consistently with her preliminary hearing account, as follows: Around 8:30 p.m. on July 13, 1996, as she pulled into the Pepe's Restaurant on Placentia, she noticed a CHP vehicle, with its lights flashing, parked behind a white BMW. As she waited in the restaurant's drive-through line, she stared absently at the BMW's driver. He leaned forward and gave her a "hard look," even though she was wearing sunglasses that would have prevented the driver from seeing if she was looking at him. After ordering and receiving her food, she parked where she could see the front half of the BMW. When she looked up, the BMW driver was out of his car and the CHP officer was close to the driver, near the driver's door of the BMW. Sarthou heard four rapid shots, and the officer fell. The BMW driver started to walk away, but returned and shot the officer in the head. The shooter then ran out of Sarthou's view, but moments later, she saw the CHP car leaving. Sarthou positively identified defendant as the driver of the BMW and the shooter of Officer Burt.

Around 8:15 p.m. on July 13, 1996, Robert Excell was traveling southbound on Placentia. While stopped for a red light at the intersection with Nutwood, he heard multiple gunshots. He turned right onto Nutwood, looked to his left, and saw a police car with its overhead lights on. Excell continued west on Nutwood, intending to pass under the State Route 57 freeway, then turn left to enter the southbound freeway on-ramp. As he proceeded, he saw a CHP car come up behind a vehicle in the adjacent lane. The CHP car's overhead lights were flashing, and defendant was driving it. Defendant veered into the far right lane, honked as if to move a vehicle in that lane out of the way, then swerved left across two lanes in front of Excell to turn onto the freeway on-ramp. Excell followed the

8

CHP vehicle onto the freeway and pursued it southward as it wove through traffic, at speeds of 80 to 85 miles per hour, until he lost sight of it near the Lincoln Avenue exit.

Around 8:30 p.m. on July 13, 1996, Paul Wilcox, a CHP dispatcher, received an inquiry from Officer Burt concerning the status of a driver's license issued to Pao or Pho D. Nguyen, born May 12, 1972. The dispatcher advised that the license in that name was currently suspended, whereupon Officer Burt requested a tow truck to respond to the Chevron station at Nutwood and Placentia.

Evidence collected at the crime scene included seven 9-millimeter shell casings, a live 9-millimeter round in the front seat of the BMW, a citation book with a bloody shoe print on it; a "CHP 180" vehicle property form; a paper bag filled with counterfeit traveler's checks; a printer, printer cartridges, and bulk quantities of high-quality bond paper found in the BMW's trunk; a wallet containing defendant's identification; and a BMW car key. Fingerprints on the bag and on a piece of paper were identified as defendant's.

Evidence, similar to that at the preliminary hearing, was presented that Officer Burt's vehicle was found abandoned near defendant's Lincoln Avenue residence; that around 10:00 p.m. on July 13, 1996, a witness saw a young Asian male hop over the bumper of a Honda as he ran from the area where the car was abandoned; and that a partial shoe print was lifted from the Honda's bumper.

When arrested in Texas, defendant was sitting on a couch. He identified white tennis shoes near the couch as his. These shoes were turned over to the Fullerton Police Department. The patterns of the soles were consistent with the bloody shoe print on Officer Burt's citation book, and were a positive match with the shoe print on the Honda bumper. Testing of blood on the shoes revealed DNA markers identical to those in a tissue sample taken from Officer Burt. The chance

9

that three particular markers common to both these samples would be found in each of two random individuals was one in six billion.

A United States Treasury Department agent testified that the 99 good-quality counterfeit traveler's checks found in the paper bag at the crime scene were worth about $10,000. These checks belonged to a larger series of already-passed counterfeit checks that had caused losses of over $240,000. The quantity and quality of the checks in the bag, and the paraphernalia —such as the bond paper, printer, and printer cartridges — found in the BMW's trunk, indicated that someone was mass producing the counterfeit instruments, or selling them in bulk.

Officer Burt suffered 11 gunshot wounds inflicted by seven bullets. There were no defensive wounds or signs of a struggle. He died of multiple gunshot injuries to his brain, lungs, and visceral organs.

### 2. *Victim impact.*

Officer Burt's wife, mother, and father testified about the devastating effect of his death on his immediate and extended family. The victim, who was 25 years old when he died, had dreamed of being a CHP officer like his father. As a result of Officer Burt's death, his father, a CHP sergeant, retired approximately one year later. Officer Burt's wife, described as his "best friend," was seven months pregnant with their first child at the time of his death. Family members described the victim as spontaneous, intelligent, sentimental, and fun-loving. The loss was especially hard for his niece and two nephews, because their father had been killed in an auto accident about nine months earlier.

### 3. *Other violent crimes.*

The prosecution presented the following evidence of other crimes by defendant involving violence or the threat of violence:

10

Mark Baker lived in a second-story apartment next to the unit defendant shared with his girlfriend, Victoria Pham. In the early morning of September 11, 1995, Baker heard scuffling in defendant's apartment. Baker went out onto the common balcony walkway, where defendant was struggling with Pham, apparently trying to push her over the railing. Defendant hit Pham on the back of the head or neck with his fist, and she fell to her knees. When Baker said, " 'Knock it off, you motherfucker,' " defendant went back into his apartment and returned with a machine gun. Defendant loaded the gun in front of Baker, pulled back the bolt, and pointed the weapon at Baker's head. Defendant said, " 'I think you called me a motherfucker' " and " '[l]et me hear you say it again.' " Baker asked if the gun was real, and defendant responded, " 'You want to find out?' " The confrontation ended when the manager of the apartment complex yelled at everyone to go back inside their apartments. Defendant reentered his unit, and Baker went to make sure the manager called the police.

On the evening of June 17, 1996, Robert Bachand, a Honda automobile salesman, accompanied defendant and another Asian man on a vehicle test drive. During the drive, defendant said " '[l]et's do this' " to his companion. Defendant then pulled a nine-millimeter Ruger semi-automatic pistol on Bachand and demanded his wallet and PIN number. Bachand gave up his wallet, which contained his ATM card. He was handcuffed and forced to lie on the back seat. Defendant said he and his companion intended to take the car, and both men seemed upset when Bachand told them he didn't know whether it had Lojack (a means of tracking a stolen vehicle). At some point, defendant handed a cell phone to Bachand, and a voice on the phone told Bachand " 'not to fuck with my guys or they will kill you.' " Bachand gave his PIN number to the person on the phone. Defendant warned Bachand that " '[y]ou don't know who you're messing with' " and " '[w]e're Asian, Vietnamese Mafia.' "

11

The men took Bachand to a house in Garden Grove or Westminster, where defendant's companion got out of the car, and another Asian man got in. Defendant handed this man the gun he had been wielding. During further travel, the cell phone rang again. A voice on the phone demanded verification of the PIN number Bachand had previously provided, complaining that " 'they' " were unable to get any money out of the account. Bachand explained this was because the account had no money. After debating whether to kill Bachand or release him, the men let him go. Later that evening, Bachand identified a crashed Honda as the one in which he had been abducted.

On the morning of July 13, 1996, the day Officer Burt was killed, Aryan Neghat was driving westbound in the fast lane of the State Route 91 freeway. A white BMW came up behind him and began following too closely, so Neghat moved to lane No. 2 to avoid contact with that vehicle. The BMW, traveling around 70 miles per hour, then pulled very close to another vehicle in the fast lane, slightly bumping it. The BMW driver reached down, transferred a gun from his right to his left hand, and waved the gun out the driver's window. The car in front quickly changed lanes, whereupon the BMW driver pulled in the gun and sped onward. That night, while watching news of Officer Burt's murder, Neghat recognized the white BMW at the crime scene as similar to the one he had encountered. In July 1996, Neghat positively identified defendant from a photo lineup as the weapon-brandishing driver he had observed, though he was unable to make a positive identification at the April 2000 penalty trial.

### 4. *Prior felony convictions.*

The prosecution presented evidence that defendant had suffered prior felony convictions (1) in 1992, for escape while misdemeanor charges were pending (§ 4532, subd. (a)); (2) in 1992, for possession of an assault weapon

12

(former § 12280, subd. (b); see now § 30605, subd. (a)) and possession of a firearm in violation of an express probation condition (former § 12021, subd. (d)(1); see now § 29815, subd. (a)); and (3) in 1993, for assault with a deadly weapon (§ 245, subd. (a)(1)) and burglary of an inhabited dwelling (§§ 459, 460, subd. (a)).

### C.  Defense penalty case.

Defendant himself was the only defense witness.  He testified in narrative form as follows:  "Thank you.  [¶]  Before I start, I would like to say that I did request for my lawyers not to say anything on my behalf, and I appreciate that. [¶]  Jurors, I am not here to ask or beg for your sympathy or pity.  Nor am I here to ask or beg of you, the jurors, to spare my life.  [¶]  Personally I believe in an eye for an eye.  I believe in two eyes for every eye.  If you were to take down one of my fellows, I would do everything that is necessary to take down at least two of yours, just to be even.  [¶]  In this penalty phase trial, the prosecutor, Mr. Jacobs, is seeking the maximum penalty, which we all know is death.  I personally feel that the maximum penalty is properly suited for this occasion.  I also feel that it is the right thing for you, the jurors, to do.  [¶]  Being in my situation now I feel it is only fair, there's a price to pay for everything in life, now that I am here it's time I pay that price.  Because, after all this entire ordeal, it is just part of the game. [¶]  That's all I have to say, your honor."  The prosecutor did not cross-examine defendant, and the defense presented no other evidence.  No rebuttal case was offered.

### DISCUSSION

### A.  Counsel-related claims: conflict of interest; ineffective assistance.

Defendant asserts that, at both the guilt and penalty stages, his counsel labored under a potential and actual conflict of interest, and that counsel's

13

performance was adversely affected by the conflict, in violation of his state and federal constitutional rights to conflict-free representation. Defendant further insists he did not validly enter a voluntary, knowing, and intelligent waiver of the conflict. In any event, defendant asserts, the record demonstrates that, in certain respects, counsel provided him with constitutionally ineffective assistance. No basis for reversal appears.

### 1. *Factual background — conflict of interest claim.*

The factual background of defendant's conflict of interest claim, unfortunately complex, is as follows: Defendant was represented at the 1996 preliminary hearing by retained Attorney Dennis O'Connell. In subsequent proceedings, O'Connell and another lawyer, George Peters, were appointed to represent defendant. Daniel Watkins was an investigator originally hired by O'Connell, and later retained by both counsel, to work on defendant's case.

On July 27, 1998, while defendant was the Orange County Jail awaiting trial in this case, he, Victoria Pham, Watkins, and another "gang member" were arrested by federal authorities. Soon thereafter, an indictment was filed in the United States District Court for the Central District of California against defendant, Pham, Huy Ngoc Ha, and Watkins. (*United States v. Hung Thanh Mai, et al.*( C.D.Cal., No. SA CR 98-82 LHM) indictment filed Aug. 6, 1998.) Count 1 accused the indicted persons of conspiring by mail and/or interstate travel to commit murder for hire, in violation of title 18 United States Code section 1958. The alleged murder target was Chang "Alex" Nguyen, a principal prosecution witness as to the state capital murder charges, whom defendant wanted killed because of his cooperation with law enforcement.[4]

---

**4** This is the same Chang Nguyen who testified against defendant at his preliminary hearing in the instant case. The federal indictment explained that

*(Footnote continued on next page.)*

14

Among other things, the federal indictment asserted that, in furtherance of the conspiracy, Watkins "traveled to Houston, Texas to locate Nguyen and his family, and that Watkins "provided . . . [defendant] and PHAM with information about . . . Nguyen so that Nguyen could be located and killed." The federal indictment also alleged that after the authorities provided defendant with fake evidence the murder had been carried out, defendant asked Watkins to see if a missing persons report had been filed in Houston for Nguyen, but Watkins warned that any such check might arouse law enforcement suspicions. According to the federal indictment, these events took place in March, April, and May of 1998.

On July 31, 1998, before the federal indictment was filed, and in anticipation of an upcoming federal bail and counsel hearing for Watkins, Attorney James Waltz, who would become Watkins's appointed federal counsel, faxed a memorandum to the federal prosecutor's office (the Waltz memo). The Waltz memo claimed the federal case against Watkins was "phony," and asserted that Waltz intended to call Peters and O'Connell, defendant's counsel in this case, as "cornerstone" witnesses in Watkins's defense. According to the Waltz memo, Watkins, while acting as Peters's investigator, and on Peters' behalf, "interacted with [defendant]. [Defendant] told [Watkins] about [defendant's] plan to kill [Nguyen] in Texas, and [Watkins] reported all that to . . . Peters, [O'Connell,] and Rob Harley, and took their directions." The memo also suggested Peters and O'Connell "should be disqualified from further representing [defendant] in state court, as their testimony in Federal court will be adverse to [defendant] . . . as they

_____

*(Footnote continued from previous page.)*

defendant, then housed in the Orange County Jail, "hired a person he believed was willing to murder Nguyen in exchange for money. However, the person [defendant] hired to commit the murder was an undercover officer . . . ."

15

all exculpate [Watkins] from any wrongdoing." The memo claimed that "all [Watkins's] activities were blessed by Peters, Harley and [O'Connell]. Just ask them. [Watkins] did nothing to aid [defendant's] plan which was well known among his defense team."

On August 7, 1998, the day after the federal indictment was filed, prosecution and defense counsel in this case addressed the trial court about the implications of the federal matter. Peters confirmed that besides defendant, "this involves a defense investigator who is also charged in the federal case," and it was therefore "possible that myself and Mr. O'Connell could be witnesses in that case, called by the other defendant." Peters indicated that he and O'Connell did not "see any actual conflicts at this point." However, in an abundance of caution, defense counsel requested the appointment of an outside attorney to advise defendant about possible conflicts. The prosecutor joined in the request. Ultimately, upon agreement by all counsel, the court appointed Attorney Gary Pohlson to review applicable materials and render an opinion on the conflict issue.

On August 21, 1998, Pohlson reported his activities and conclusions in open court, with defendant and all counsel present. Pohlson acknowledged that Peters and O'Connell would likely be called as witnesses in the federal case, and that a potential conflict arises whenever counsel are required to testify in a matter involving a client. However, Pohlson indicated that after reviewing materials related to the federal case, including the Waltz memo, and speaking with O'Connell, Peters, and the federal prosecutor, he foresaw no possibility that anything Peters or O'Connell would say in their federal testimony would be harmful to defendant in either the federal or the state case.

Pohlson further stated he had explained to defendant (1) the dangers of conflicted counsel, (2) that upon proper advisement defendant could waive any conflict that did exist, and (3) that if the conflict was validly waived, defendant

16

could not rely on it later as a basis for attacking the state judgment. According to Pohlson, defendant indicated he did not believe a conflict existed and confirmed that he wished to retain Peters and O'Connell as his state counsel.

The prosecutor, Orange County Deputy District Attorney Evans, agreed he could foresee no actual conflict. In particular, the prosecutor represented that he was largely ignorant of information gathered in the federal investigation, and that, in the instant proceeding, "I don't intend to, and I will not use anything that was gathered in terms of information or evidence, and we will not derive anything from what was gathered, we won't use it even in a derivative sense."[5] Peters and O'Connell confirmed their views that there was no actual conflict, based on what they currently knew about the federal and state cases. Peters iterated that if he did testify in the federal case, "I believe I would have nothing to say that would harm [defendant]."

The court then engaged defendant in an extended colloquy on the conflict issue. The court preliminarily confirmed that defendant wished to waive any conflict of interest and retain Peters and O'Connell as his counsel. The court

---

[5] This assertion stands in slight tension with the representations made in a March 2, 2000, federal court hearing addressing whether there should be some relaxation of defendant's stringent confinement conditions in the Los Angeles federal detention center while he prepared for his penalty trial in this case. Present at the hearing, among others, were defendant's state trial counsel, Peters, and Orange County Assistant District Attorney Jacobs, who had taken over the state prosecution from Evans. Among the issues was whether defendant should be allowed to review, in his cell, some 7,000 pages of discovery from the federal case. Discussing the relevance of these materials to defendant's penalty defense, both Peters and Jacobs indicated that, while the prosecution was bound to not introduce evidence from the federal investigation in its *case-in-chief*, some such evidence could come in on cross-examination, or as rebuttal to any mitigating evidence defendant might present. Ultimately, no evidence from the federal case was presented at defendant's penalty trial.

17

recited that, based on the information presented, "there [was] an appearance of a potential conflict," that it appeared there was no actual conflict, that the court could not finally determine whether an actual conflict existed, but that, if it did, such a conflict would likely "not render the representation of defense counsel ineffective in and of itself."

The court advised defendant that "[b]ecause of that appearance of conflict, or potential conflict, or conflict," his lawyers might not be able to furnish effective representation, and he might not have a fair trial if represented by these counsel. Further, the court admonished defendant that, "should you have ineffective counsel, your chances of being convicted are greater, and when you waive your right to conflict free counsel, you are also waiving an appeal based on that conflict." Defendant confirmed that he understood. Defendant also agreed he had spoken with Pohlson, who had given him the same advisements.

The court then asked defendant whether "[h]aving been advised of your right to be represented by attorneys free of conflict, and having understood the disadvantage and dangers of being represented by attorneys with conflicts, do you specifically give up the right to be represented by attorneys who have no conflict of interest?" Defendant responded, "Yes." Defendant agreed that no threats or promises had been made to secure the waiver, and the court confirmed that all counsel concurred in defendant's decision. Finally, the court adopted, and obtained defendant's understanding of, the prosecutor's further statement that defendant could withdraw his waiver at any future time if he discerned that a conflict of interest was adversely affecting the quality of his counsel's representation.

At a progress hearing in state court in December 1998, Attorney Peters reported that he was involved in ongoing negotiations with the United States Attorney's Office on defendant's behalf with respect to the federal indictment.

18

Peters reported that a term under discussion in those negotiations was that defendant would agree to plead guilty in the instant case. Peters explained that, immediately upon the filing of the federal indictment, he had visited defendant, who made an "impassioned plea" that he "felt extremely responsible" for drawing Pham into the plot to murder Nguyen, and "wanted to do anything he could to rectify the situation, particularly with her." Peters reported that defendant "gave me specific directions. And since that time I have been working on those directions, because I believe it is the right thing to do."

On March 9, 1999, defendant pled guilty in federal court to all counts of the federal indictment, pursuant to an agreement previously reached with the federal prosecutor.[6] The agreement included defendant's promise that he would also plead guilty in the instant proceeding to the murder of Officer Burt, and would admit the special circumstance allegation that he intentionally killed a peace officer engaged in the performance of duty, subject to a trial to determine the appropriate penalty. It also provided for the continued imposition of very severe confinement conditions for the duration of defendant's federal incarceration, and included defendant's waiver of the right to serve his entire federal term before any state death sentence was carried out.

---

[6] These counts included not only the murder conspiracy charge (Count One), but charges of the substantive offense of using the mail or interstate travel with the intent that murder for hire be committed (Count Two; 18 U.S.C. § 1958), and a charge that defendant aided, abetted, counseled, commanded, induced, and procured the commission by his federal codefendant, Ha, of the offense of knowingly and unlawfully possessing a machine gun (Count Three; 18 U.S.C. §§ 2(a), 922(*o*)(1)). The stipulated facts supporting Count Three were that in January 1998, defendant arranged for the sale of a MAC-11 machine gun and silencer, which were delivered to the undercover officer by Ha. The stipulation recites that two days later, the weapon malfunctioned during a test firing, causing a fatal head wound to the range officer.

As consideration for defendant's plea, the federal prosecutor promised to recommend, with respect to defendant, certain sentencing guideline reductions, provided defendant met specified conditions. The federal prosecutor also promised to give "due consideration to the mitigating role" that Pham played in the Nguyen murder conspiracy, "and accordingly to recommend a sentence for Pham based on that lesser role," under the federal sentencing guidelines.

Attached to the federal agreement was a recitation of the factual basis of the plea. The parties stipulated that the facts set forth in the recitation could be proved beyond reasonable doubt in a trial. The redacted version of the recitation included in the instant record stated, among other things, that "codefendant #4" (clearly Watkins) gave defendant a photo of intended murder victim Nguyen, which photo "codefendant #4" had obtained from discovery materials provided by the state prosecutor in this case. The recitation further stated that "codefendant #4" warned defendant against attempting to confirm Nguyen's death by checking for a missing persons report, and instead offered to make some "inquiries" by pay phone when he was in Houston. No portion of the factual recitation suggested that Peters or O'Connell had any role in "codefendant #4's" activities, or in those of any other defendant in the federal case.

In June 1999, Watkins pled guilty, pursuant to agreement, to a reduced federal charge of accessory after the fact to the offense of using the mail with intent that a murder for hire be committed (18 U.S.C. § 3). The agreement recited that, knowing defendant had committed the underlying substantive offense, Watkins "assisted [defendant] with the intent to hinder or prevent [defendant's] apprehension, trial, and punishment" for that crime. Nothing in this recitation implicated Peters or O'Connell.

On July 23, 1999, in the instant case, the court addressed the defendant's request to waive his trial rights with respect to guilt and special circumstance

20

findings, and to stipulate that the trial court could determine those issues on the basis of the preliminary hearing transcript.  At the plea hearing, the court took particular note of the condition in defendant's federal plea agreement that he plead guilty in the instant case.  Accordingly, the court sought to assure itself that his waivers of trial rights were truly knowing, voluntary, and intelligent, and not the result of duress, coercion, threats, or promises.

Attorney Peters explained that defendant's motive for entering the federal plea agreement, though it provided him virtually no personal benefit, was to obtain, at any sacrifice to himself, any advantage he could secure for Pham.  On the other hand, Peters represented, and the state and federal prosecutors — both of whom were present — agreed, that defendant was under no practical obligation, by virtue of the federal plea agreement, to enter a "slow plea" in the state case.  All federal sentencing jurisdiction over defendant and Pham had ended, and all terms of the agreement requiring the federal prosecutor to make recommendations concerning Pham's prison placement had been satisfied.  Neither the state nor the federal prosecutor sought to hold defendant to the federal agreement's requirement that he plead guilty to Officer Burt's murder.

Rather, Peters, citing his experience as a capital trial lawyer, indicated that "I made an analysis and . . . based on the quality of evidence against [defendant] and the nature of some of that evidence, . . . I have always realized that if we had anything to say and wanted credibility, we have to do it at the penalty phase.  That's why I am willing to do this."  As Peters explained, the prosecutor "is going to put this evidence on anyways [at the penalty phase], some of it, and hopefully it will be lesser than he would have otherwise.  And I need, if I am going to have any hope of looking jurors in the eye and making the pitches I want to make, that I have to have the highest degree of credibility with them, and I can have that credibility by pointing out that [defendant] has done the right thing [by not

21

insisting on a guilt trial]." Indeed, Peters made clear, defendant "is not begging for anything," and "may not even want to . . . present[ ] evidence in the penalty phase, he hasn't made that decision yet, and that's up to him."

In response to a request from the prosecutor that the record be made clear, Peters obtained defendant's confirmation that he had explained to defendant the "tactical and strategic reasons" for submitting the guilt and special circumstance issues, that defendant did not disagree with this advice, that defendant could do nothing more to help or hurt Pham, and that he was not required to waive his trial rights. The court accepted the stipulation.

However, the court revisited the issue on July 30, 1999. Counsel reported defendant was disturbed by newspaper articles that apparently cited the *tactical* reasons *counsel* had given the previous week for agreeing to the "slow plea" procedure — i.e., doing the "right thing" in order to preserve credibility at a penalty trial — as defendant's *personal* reasons for stipulating to submission on the preliminary hearing transcript. Allowed to make a statement on his own behalf, defendant said he was "not doing this so-called plea" in hopes of "sav[ing] face or retain[ing] credibility for future jurors," and was not "asking for mercy or pity or sympathy from future jurors," but was acting for "my own personal reasons." Defendant indicated that "[w]hatever reasons my lawyers might have, strategic or other, they have discussed that with me," and he assumed counsel were "obligated to follow through with that," but as far as he was concerned, "[w]hatever results emerge from my penalty phase and my sentencing, so be it."

Defendant declined to indicate what his "personal reasons" were, but he insisted they did not include the hope of gaining anything for himself or for Victoria Pham. He again confirmed he was acting freely and voluntarily. The court thereupon indicated it was satisfied that defendant's waiver of a guilt and special circumstance trial was appropriate.

22

On the basis of this factual record, defendant now claims his trial counsel faced a potential conflict of interest arising from concerns about their personal involvement in the Nguyen murder conspiracy case, and in the conspiracy itself. This potential conflict, defendant insists, ripened into an actual one because, as a matter of fact, it adversely affected counsel's performance in the instant case, influencing them to refrain from providing a competent and vigorous defense at all phases of the state capital trial. Moreover, defendant maintains, his purported waiver of any conflict was invalid, because the record indicates he was not sufficiently apprised of the pressures that might bear on counsel's ability to give him zealous and undivided loyalty. He further asserts that aspects of his counsel's performance were professionally deficient regardless of any conflict. As we will explain, we find no merit in these contentions.

2. *Applicable law.*

A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) includes the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for

23

ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. (E.g., *People v. Vines* (2011) 51 Cal.4th 830, 875-876 (*Vines*); *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

The federal and state constitutional right to counsel in a criminal case also includes the right to representation free of conflicts of interest that may compromise the attorney's loyalty to the client and impair counsel's efforts on the client's behalf. (E.g., *Glasser v. United States* (1942) 315 U.S. 60, 69-70; *People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).) For both state and federal purposes, a claim of conflicted representation is one variety of claim that counsel provided ineffective assistance. Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different. (*Mickens v. Taylor* (2002) 535 U.S. 162, 166 (*Mickens*); *Doolin*, *supra*, at pp. 417-418, 421; see *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)

When addressing an appellate claim that a conflict of interest adversely affected counsel's performance, the reviewing court is " 'bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have

24

caused any such omission.' (*People v. Cox* (2003) 30 Cal.4th 916, 948-949.)"
(*Doolin*, *supra*, 45 Cal.4th 390, 418.)

The defendant may voluntarily, knowingly, and intelligently waive a conflict of interest. But the court must take steps to ensure that any waiver of a possible conflict meets those standards. If, after inquiry, the court determines that a waiver is necessary, it must satisfy itself that the defendant (1) has discussed with his or her own counsel, or with an outside attorney if he or she wishes, the potential drawbacks of representation by counsel who may have a conflict of interest; (2) has been advised of the dangers of conflicted representation in his case; and (3) voluntarily wishes to waive that right. Where the court fails to fulfill these duties, reversal is required if the defendant can establish that counsel's performance was deficient, that an actual conflict of interest was the reason for the deficiency, and that it is reasonably probable the deficiency adversely affected the outcome of the case. (*People v. Sanchez* (1995) 12 Cal.4th 1, 47 (*Sanchez*); *People v. Bonin* (1989) 47 Cal.3d 808, 837-838; *People v. Mroczko* (1983) 35 Cal.3d 86, 110; see *Doolin*, *supra*, 45 Cal.4th 390, 417-418, 421.)

### 3. *Waiver of conflict of interest.*

The People urge at the outset that defendant validly waived any conflict of interest arising from his counsel's connection to the federal case. We agree.

Here, the court perceived a possible conflict of interest and, as the cases require, it addressed the issue with considerable care. The court appointed independent counsel to investigate and advise defendant on the subject, and confirmed that independent counsel had done so. Before taking defendant's waiver, the court warned him of the essential danger of conflicted representation, i.e., that the conflict might induce counsel to "pull their punches" when representing him in the instant case. It was further agreed on the record that

25

defendant could withdraw the waiver at any time if a conflict actually materialized and he perceived it was affecting his counsel's performance. Hence, it appears defendant was generally apprised of the considerations that should influence his waiver decision.

Nonetheless, defendant complains that because the court's inquiry into the conflict, and the advisements he received, were inadequate, his purported waiver was not knowing, voluntary, and intelligent. He asserts that, while he was warned about the chance his counsel might be *witnesses* in the federal matter, and was assured they would say nothing to inculpate *him*, he was never informed of the Waltz memo's insinuations that *counsel themselves* had committed serious ethical and criminal violations by "direct[ing]" and "bless[ing]" Watkins's involvement in the Nguyen murder plot. Defendant insists he should have been told that counsel's exposure to personal criminal liability might motivate them to "pull their punches" when representing him, in order to curry favor with both federal and state prosecutors in hopes of avoiding the consequences of their own derelictions. Indeed, defendant posits, by accepting assurances that there appeared no chance his counsel would testify unfavorably to him in the federal matter, he may mistakenly have believed that there *was no* potential conflict, and that he could therefore safely enter his waiver.

However, as we have consistently said, waiver of a possible attorney conflict of interest is not invalid simply because all conceivable ramifications of the potential conflict were not explored or explained, and the waiver does not extend only to those matters discussed on the record. (E.g., *People v. Roldan* (2005) 35 Cal.4th 646, 728; *People v. Carpenter* (1997) 15 Cal.4th 312, 375; *Sanchez*, *supra*, 12 Cal.4th 1, 47-48.) Indeed, where no actual conflict has materialized at the time the waiver is taken, it may simply be impossible to foresee future developments that could have a genuine effect on counsel's loyalty and

26

zeal; on the other hand, sources of conflict that are merely speculative and conjectural need not be addressed.

That is the situation presented here. The sole basis in the record for the proposition that defendant should have been warned about his counsel's possible direct criminal involvement in the Nguyen murder conspiracy is the Waltz memo, which Independent Counsel Pohlson reviewed. But that document is an exceedingly weak foundation upon which to build such a theory.

Defendant characterizes the Waltz memo as containing "allegations" by Watkins himself that his criminal assistance to defendant in the Nguyen murder plot was "directed" and "blessed" by defendant's attorneys, Peters and O'Connell. On the contrary, Waltz's off-the-cuff assertions, apparently made prior to his actual appointment as Watkins's federal lawyer, did not amount to direct "allegations" by Watkins. At most, they appear to have been a lawyer's clumsy, informal, and preliminary attempts to advocate on a potential client's behalf, and perhaps to apply some kind of tactical leverage against Peters and O'Connell as potential witnesses in Watkins's case. Pohlson could reasonably conclude they exhibited no indicia of credibility sufficient to invoke a genuine concern about counsel's criminal involvement in the acts charged against Watkins by the federal indictment.

Moreover, by its terms, the ambiguously worded Waltz memo did not explicitly claim Peters and O'Connell knew of, directed, or blessed any criminal activity by Watkins. While the memo declared that Watkins "interacted" with defendant, that defendant told Watkins of his plan to kill Nguyen, and that Watkins "reported all that" to defendant's counsel, the memo also insisted that the federal charges against Watkins were "phony" and "trumped up," that Watkins "did nothing to aid [defendant's] plan," and that any testimony by Peters and O'Connell in Watkins's federal case would "exculpate [Watkins] from any

27

wrongdoing." It is reasonable to assume Waltz believed Peters and O'Connell would say, truthfully, that Watkins did nothing illegal on their orders, and that any activities of Watkins they "direct[ed]" or "blessed" were legitimate.

Finally, it was entirely reasonable, upon review of the Waltz memo, to conclude at the time the waiver was entered that the principal source of potential conflict it revealed was the possibility counsel would be called as witnesses in Watkins's defense. Indeed, the only reason the Waltz memo expressed for its claim that Peters and O'Connell should be disqualified from representing defendant in this case was that "their testimony in Federal court [would] be adverse *to* [*defendant*]" insofar as it exculpated Watkins.

Under these circumstances, neither Independent Counsel Pohlson nor the court was reasonably obliged to speculate further about what conflicts might arise as a result of the federal investigation into defendant's murder plot and the resulting indictment. There was no requirement to advise defendant that, aside from the chance Peters and O'Connell might be called as witnesses on Watkins's behalf, another source of conflict might be their own potential criminal liability for his activities. Accordingly, defendant's waiver of a potential conflict of interest was valid when given.

### 4. *Claims of ineffective and conflict-related adverse representation.*

In any event, defendant's complaints against his counsel fail on the merits. He is unable to show on the appellate record that any potential conflict of interest actually materialized. Further, the record fails to demonstrate that any conflict of interest resulted in adverse performance by his counsel, or that counsel otherwise rendered ineffective assistance.

At the outset, there is no evidence on the record that Defense Counsel Peters and O'Connell were called as witnesses in the federal case, or ever became

28

the focus of any state or federal investigation into their own criminal involvement in the activities of their investigator, Watkins. Indeed, the record belies any such developments. As noted above, Watkins never went to trial in the federal case against him; in June 1999, he entered a negotiated plea to a reduced charge of accessory after the fact in the conspiracy to murder Chang Nguyen. The brief factual recitation included in the plea agreement made no reference to Peters or O'Connell. Similarly, in March 1999, defendant himself entered a negotiated plea to the federal charges against him. His plea agreement attached an extensive factual recitation of his central role in the murder plot, but again, it included no mention of any involvement by Peters and O'Connell.

These events occurred before July 23, 1999, when defendant entered his "slow plea" to the capital charges in this case. By this time, therefore, it appears counsel was not burdened by any actual, or even potential, conflict arising from the chance they would be called as witnesses in the federal proceedings against Watkins or defendant.

But even if we assume a potential conflict remained because of the possibility Peters and O'Connell might still be criminally charged in the Nguyen murder plot, the record discloses no adverse or ineffective performance by his counsel. Defendant cites several actions or omissions by counsel that he deems adverse, deficient, and conflict related, but the record does not support his claims.

a. *Federal plea agreement; "slow plea" strategy.*

First, defendant urges the potential conflict caused counsel to engineer his onerous plea agreement in the federal case, by which he additionally, and prejudicially, bound himself to plead guilty to the murder charge and peace officer special circumstance allegation in this case. But the record suggests otherwise. Without objection by defendant, Peters explained in state court that the reason

29

defendant acceded to the federal terms was to obtain, at any sacrifice, whatever benefit he could for his girlfriend and federal codefendant, Victoria Pham. The government agreed, in return for defendant's federal plea, to make certain leniency recommendations for Pham, and it honored its promise.

In any event, defendant fails to demonstrate from the record that the agreement resulted in his "slow plea" here. Again, the evidence is to the contrary. Before allowing defendant to submit the guilt and special circumstance issues on the preliminary hearing transcript, the instant trial court took particular note of the "plead guilty" term of the federal agreement and inquired about its significance. The federal and state prosecutors stressed they did not deem defendant bound by his federal promise, and they conceded there was nothing the government could do by that time if he breached it. Peters explained the "slow plea" was not influenced by the federal agreement, but was a tactical and strategic decision, based on the premise that the evidence against defendant was overwhelming, that there was little if any chance a jury would exonerate defendant of capital charges, and that a penalty jury might be better disposed toward defendant if the jurors knew he had "done the right thing" by waiving a trial on the issue of guilt.

The record confirms the strength of the evidence that defendant murdered a police officer during a routine traffic stop in order to escape arrest for a third strike offense. Counsel also presumably knew a penalty trial would likely reveal defendant as a violent sociopath with a significant, gang-affiliated criminal background, even without the evidence that he orchestrated, from behind bars, a plot to kill a principal prosecution witness in this case. Counsel thus faced a particularly difficult task in defending the case at both the guilt and penalty phases.

Under these circumstances, where realistic lines of defense were few, it was tactically and strategically reasonable to acquiesce in a "slow plea" on the guilt

30

and special circumstance issues, in hopes of preserving some credibility and sympathy before a penalty jury. The record does not show that a different strategy would likely have been adopted by competent, unconflicted counsel. Hence, it fails to demonstrate either conflict-driven adverse performance, or ineffective assistance, on counsel's part. (See *Doolin*, *supra*, 45 Cal.4th 390, 424.)

Defendant insists counsel's "slow plea" strategy was adverse and incompetent insofar as defendant failed to receive a return benefit and, in particular, a prosecutorial promise not to seek the death penalty. But the record contains no inkling that counsel could reasonably have expected such benefits. Common sense suggests the prosecution would not likely have offered favorable terms in a case presenting overwhelming evidence that defendant murdered a peace officer in cold blood to avoid arrest and prosecution for other crimes. Again, the record affords no ground to conclude that counsel's failure to seek such benefits constituted adverse performance stemming from a conflict of interest, or was otherwise professionally deficient.[7]

Defendant also contends his counsel's agreement to a "slow plea" was adverse and incompetent insofar as it deprived him of a "compelling" trial argument against the sole special circumstance allegation, that he murdered a peace officer "engaged in the performance of . . . duties." (§ 190.2(a)(7).) This

---

[7] Defendant suggests counsel might have offered defendant's cooperation in providing information about the conspiracy to murder Nguyen in return for a promise of leniency. However, it seems particularly unlikely state prosecutors would have given up their right to seek death for defendant's *actual murder* of a CHP officer in return for defendant's help to *federal* prosecutors in a case involving a mere unsuccessful plot to kill a witness in the state case. Hence, so far as appears from the record, defendant's counsel had reasonable grounds not to pursue this avenue, and there is no basis to believe competent, unconflicted counsel would likely have acted differently.

claim is premised on the rule that murder of a peace officer "engaged in . . . duties" is only committed when the officer was exercising his or her authority *lawfully* at the time the lethal act occurred. (E.g., *People v. Cruz* (2008) 44 Cal.4th 636, 673; *People v. Mayfield* (1997) 14 Cal.4th 668, 791 (*Mayfield*); *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217.)

As defendant observes, a police detention, including a traffic stop, is an unlawful "seizure" under the Fourth Amendment absent specific articulable facts that objectively manifest a possibility the person detained is violating the law. (E.g., *Delaware v. Prouse* (1979) 440 U.S. 648, 663; *People v. Hernandez* (2008) 45 Cal.4th 295, 299; *Mayfield*, *supra*, 14 Cal.4th 668, 791.) Defendant asserts a jury could have found the prosecution had been unable to prove beyond reasonable doubt that Officer Burt "lawfully" stopped and detained him on July 13, 1996.

The pertinent circumstances are as follows: Defendant's murder of Officer Burt prevented the victim from explaining why the stop occurred. At the preliminary hearing, prosecution witness Nguyen testified defendant told him the officer stopped him because his lights were not on, although defendant thought they were on. As in effect in 1996, the traffic laws required vehicles to turn on their lights from one-half hour after sunset until one-half hour before sunrise, or in other poor visibility conditions. (Veh. Code, §§ 280, 24400, 38335.) The stop occurred in the early evening of July 13, 1996 — sometime after 8:00 p.m. — but the record does not disclose the exact time of sunset in Fullerton on that midsummer day, and eyewitness Bernice Sarthou testified the sun had not yet set when the stop occurred.[8] Thus, defendant urges, he might have persuaded a jury

---

[8] Sarthou also testified, however, that she observed the traffic stop about 8:30 p.m., when she pulled into the driveway of an adjacent restaurant. Moreover, by

*(Footnote continued on next page.)*

there was reasonable doubt whether the prosecution had established the lawfulness, *ab initio*, of the traffic stop that eventually led to Officer Burt's murder.

However, even though the peace officer special circumstance was crucial to defendant's eligibility for the death penalty, counsel were not compelled to pursue an "illegal stop" strategy regardless of its chances of success. It is noteworthy that after reviewing the preliminary hearing transcript, the learned trial court, acting as a fact finder, implicitly found all elements of the special circumstance, including the "lawful duty" element, proven beyond reasonable doubt. Elsewhere in this opinion, we uphold this implicit finding; we consider on the merits, and reject, defendant's claim that there was *insufficient* evidence from which a rational fact finder could find beyond reasonable doubt that Officer Burt was lawfully performing his duties when he was killed.

Thus, experienced trial counsel could rationally conclude, for several reasons, that the overall risks of trying the special circumstance issue outweighed the benefits. In the first place, counsel knew that in any jury trial, the jury would be exposed to persuasive evidence defendant had gunned down Officer Burt during a routine traffic stop in order to avoid arrest and conviction for a third strike offense. Under these circumstances, counsel could harbor a reasonable concern that lay jurors would find an "illegal stop" argument hypertechnical and cynical, would reject it out of hand, and would carry residual hostility over to their penalty deliberations — the very kind of danger counsel sought to prevent.

*(Footnote continued from previous page.)*

an order entered June 27, 2013, we have taken judicial notice that sunset occurred in Fullerton on July 13, 1996, at 8:04 p.m., approximately one-half hour earlier.

Moreover, counsel had grounds for concern that the evidence at such a trial — and, in particular, evidence on the issue of "lawful duty" — would not necessarily be limited to that adduced at the preliminary hearing. The prosecution, mindful of its trial duty to prove every guilt and special circumstance element beyond reasonable doubt (as opposed to its preliminary hearing duty merely to show sufficient evidence to *warrant* a trial), could be expected to enhance its effort to establish that Officer Burt was acting lawfully when he was killed. By submitting the special circumstance issue on the preliminary hearing transcript, defendant avoided such additional proof, forced the trial court to decide whether the preliminary hearing evidence alone persuaded it that "lawful duty" had been established beyond reasonable doubt, and, in the event the trial court so found, preserved his right to argue on appeal, as he does, that this evidence was not legally sufficient. (*Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 604 [defendant who submits cause on transcript preserves right to argue on appeal regarding sufficiency and legal significance of evidence]; *People v. Martin* (1973) 9 Cal.3d 687, 694-695 [same].)[9]

---

[9]     Defendant asserts that counsel, while submitting on the evidence adduced at the preliminary hearing, should, and if unconflicted likely would, at least have argued *to the trial court* that this evidence did not establish the "lawful duty" element beyond a reasonable doubt. But competent, unconflicted counsel could conclude otherwise. Aside from an assessment that such an argument was unlikely to succeed, counsel could fear it would cause the prosecution to seek the opportunity to adduce further evidence on this issue. Even if defendant was willing to submit his cause on the evidence adduced at the preliminary hearing, the prosecution was not necessarily compelled to agree to such a procedure. Had the People been alerted to a claim that, in fact, their showing at the preliminary hearing failed to meet the reasonable-doubt standard on any guilt or special circumstance element, no reason of fairness or logic suggests they were foreclosed from insisting on the right to present further evidence, whether before the court or a jury, to bolster their case. (But cf., *People v. Ernst* (1994) 8 Cal.4th 441, 446-447 [prosecution may not exercise its right to jury trial over defendant's plea of

*(Footnote continued on next page.)*

The record on appeal does not disclose that counsel failed to weigh the possibility of further litigating the "illegal stop" issue, that competent, unconflicted counsel would likely have pursued such a strategy, or that any conflict of interest actually influenced his counsel's decision not to do so. Accordingly, defendant has not demonstrated counsel's conflict-related adverse performance in this respect.

### b.    Penalty phase strategy.

Defendant urges the record includes "circumstantial evidence" that counsel, influenced by their conflict of interest, performed adversely with respect to the penalty trial by failing to challenge the prosecution's aggravating evidence, by omitting to inform him fully about potentially available mitigating evidence, by acceding to his wishes to present no mitigating evidence or argument, and by making an insufficient effort to dissuade him from taking the stand to invite a death sentence.  Indeed, he suggests, the record permits an inference that counsel actually encouraged his decision not to fight for his life.  We disagree.

### i.    Failure to challenge aggravating evidence.

Defendant urges that his attorneys, burdened by a conflict of interest, performed adversely to his interests at the penalty trial by failing to conduct more than desultory cross-examination of prosecution witnesses, by making few objections to evidence, by stipulating to various facts, and by failing to dispute the

---

*(Footnote continued from previous page.)*

guilty].)  As noted in the text, the strategy chosen by counsel avoided this pitfall, kept open the possibility the trial court would find the preliminary hearing evidence unpersuasive, and, if the court failed to do so, preserved defendant's right to raise an insufficient-evidence claim on appeal.

prosecution's claim that defendant carjacked and kidnapped Robert Bachand during a vehicle test drive.

However, we have made clear that "[s]uch matters as whether objections should be made and the manner of cross-examination are within counsel's discretion and rarely implicate ineffective assistance of counsel." (*People v. McDermott* (2002) 28 Cal.4th 946, 993; see *People v. Bolin* (1998) 18 Cal.4th 297, 334.) Defendant points to no exculpatory or impeachment evidence that further examination would have elicited. " 'We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' " (*Bolin*, *supra*, 18 Cal.4th at p. 334, quoting *People v. Cox* (1991) 53 Cal.3d 618, 662, fn. omitted.) Nor does such unsubstantiated speculation allow us to infer that unconflicted counsel would likely have acted differently.

In particular, defendant suggests counsel knew of grounds to challenge the Bachand carjacking evidence and, if competent and unconflicted, would likely have mounted such a challenge. As support for this contention, defendant points to his own courtroom outburst during the testimony of Bachand, an automobile salesman. When Bachand recounted that two men, of whom defendant was the taller, approached him with a request to test drive a 1996 Honda Prelude, defendant interrupted to shout, "This is fucking bullshit. What the fuck am I going to carjack a piece of shit Honda? [¶] If I were in the car I would have wasted your fucking ass, it would have been stupid." When Bachand said to defendant, "You had your chance," defendant asserted, "You fucking ass, I will put something on."[10] Defendant also points to Attorney Peters's statement at the hearing on the

---

[10]     A few moments later, Bachand said that after he was handcuffed at gunpoint and forced to lie down in the carjacked vehicle's back seat, defendant warned him to cooperate in handing over his ATM card and PIN number because

*(Footnote continued on next page.)*

36

automatic motion for modification of the death verdict that he had tried to persuade the prosecutor not to present the carjacking incident "because I knew from my own investigation that [defendant] was not good for [i.e., did not do] that."

But nothing in the record passages defendant cites is *evidence* that undermines the prosecution's proof of the carjacking incident. In response to careful questioning by the prosecutor and the court, Bachand positively identified defendant as the taller man who requested the test drive and later participated in abducting him at gunpoint. The record discloses no ground to conclude that any evidence to discredit this testimony existed, that defendant's counsel knew or should have known of such evidence, or that counsel would likely have produced it if competent and unconflicted. Defendant's claim must be rejected.

### ii. *Failure to pursue mitigating evidence.*

Defendant next urges that, in one respect, the record indicates counsel failed in their duty to investigate and present to the client potentially significant mitigating evidence before acceding to his wishes not to offer it in mitigation. (See, e.g., *Douglas v. Woodford* (9th Cir. 2003) 316 F.3d 1079, 1089-1090.) Defendant points to his counsel's representations that his girlfriend, Victoria Pham, had said his behavior became more violent after a near-fatal auto accident; as a result, according to counsel, the defense psychologist, Dr. Veronica Thomas, recommended neuropsychological tests, and perhaps an MRI or CAT scan, to

_____

*(Footnote continued from previous page.)*

" '[y]ou don't know who you are messing with' " and " 'we're Asian, Vietnamese Mafia.' " At this point, defendant interrupted again to say, "Asian Mafia, stupid fuck."

determine whether defendant had sustained brain damage. Defendant notes that counsel's billing records fail to indicate that Dr. Thomas, or any other qualified mental health expert, ever conducted such tests, and we must thus assume they were not performed.

But even if we so assume, the record discloses no basis to conclude counsel's failure to pursue this line of inquiry, and to advise defendant of the results before agreeing not to present them, was deficient performance influenced by their asserted conflict of interest. To the extent the record sheds any light at all on the subject, it suggests a different explanation.

In mid-1999, over eight months before the actual commencement of the penalty trial, counsel represented that they intended to pursue testing for brain damage, and were preparing to do so, as a priority matter, subject to approval of the necessary funding. However, the record contains circumstantial evidence that the defense team, including Dr. Thomas, thereafter became absorbed in an effort to deal with defendant's increasing anger and emotional instability caused, in part, by the restrictive conditions of his federal confinement. There are indications that this anger and instability, resulting in defendant's *lack of cooperation* with Dr. Thomas, may be the ultimate reason why such tests were never administered.

As discussed in greater detail in part A.4.c below, defendant, following his federal conviction, was held in *federal* detention pending his trial on these state capital charges. He was subject to the harsh confinement conditions dictated by his federal plea agreement. His subsequent serious rule violations while confined led to even more severe restrictions imposed by the federal district court and his federal jailors. In the months and weeks preceding his state trial, he was kept under constant surveillance, and in essential isolation, except for access to the defense team.

38

During this period, and through the commencement of the penalty trial, counsel, assisted by Dr. Thomas, worked tirelessly to obtain a relaxation of these conditions, citing the psychological effects of defendant's confinement on defense efforts to prepare for the trial. To that end, counsel and Dr. Thomas represented in various fora that, though defendant was not incompetent, the emotional and psychological toll of his confinement was impairing his attitude and willingness to cooperate, to the extent that Dr. Thomas was "unable to move forward" with her work for the defense and could not complete that work.

Thus, though the record does not establish for certain the reason tests for brain damage were never done, it does not support the inferences defendant seeks to draw. It fails to demonstrate that counsel's deficient performance, arising from a conflict of interest, was the reason for any failure to administer the desired tests, or that such tests would likely have been administered but for counsel's conflict and incompetence.

### iii. Failure to present mitigating evidence and argument.

Next, defendant urges that counsel, influenced by their conflict of interest, performed deficiently by acceding to his wish not to present available mitigating penalty evidence. Defendant concedes that counsel does not necessarily act incompetently by honoring the client's wishes not to present such evidence (*People v. Lang* (1989) 49 Cal.3d 991, 1031 (*Lang*); see *People v. Howard* (1992) 1 Cal.4th 1132, 1185; *People v. Edwards* (1991) 54 Cal.3d 787, 811),[11] but he

---

[11] As we explained in *Lang*, "[t]he proposition that defense counsel should be forced to present mitigating evidence over the defendant's objection has been soundly criticized by commentators. [Citations.] As these commentators point out, an attorney's duty of loyalty to the client means the attorney 'should always remember that the decision whether to forego legally available objectives or methods because of non-legal factors is ultimately for the client . . . .' [Citation.]

*(Footnote continued on next page.)*

asserts that counsel need not do so (see *People v. Roldan*, *supra*, 35 Cal.4th 646, 682 [counsel, not client, has control over all but most fundamental trial decisions]; *People v. Welch* (1999) 20 Cal.4th 701, 728-729 [same]) and should overrule a client they suspect is unable to make a rational decision. Here, he asserts, his counsel knew he was psychologically unstable, and sometimes irrational, as the result, among other things, of his harsh confinement conditions.

Moreover, defendant asserts that counsel's decision deprived him of a substantial mitigating case, including evidence he was the illegitimate child of a Vietnamese "bar girl" and a South Vietnamese soldier, was rescued from war-torn Vietnam at the age of four, and never again had contact with either parent until he saw his father at the time of the capital trial.

Again, however, the record does not support defendant's theory that counsel's decision, at defendant's own insistence, to present no mitigating penalty evidence stemmed from a conflict of interest. Nor does it indicate that defendant

---

*(Footnote continued from previous page.)*

To require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client. Moreover, imposing such a duty could cause some defendants who otherwise would not have done so to exercise their Sixth Amendment right of self-representation [citation] before commencement of the guilt phase [citations] in order to retain control over the presentation of evidence at the penalty phase, resulting in a significant loss of legal protection for these defendants during the guilt phase." (*Lang*, *supra*, 49 Cal.3d 991, 1030-1031.) No different standards or considerations should apply simply because, on appeal, the defendant applies a "conflict of interest" gloss to counsel's decision. As *Lang* suggested, counsel's accession to the client's considered desire to present no mitigating evidence demonstrates *loyalty* to the client, not conflict-related *disloyalty*.

40

was acting irrationally in seeking to present no mitigating case. On the contrary, the record is replete with indications that counsel pursued evidence about the circumstances of defendant's birth and his escape from Vietnam, and were prepared to present that evidence. Indeed, counsel obtained trial delays, and surmounted various bureaucratic, diplomatic, and logistical difficulties, in a successful effort to bring defendant's father and uncle from rural Vietnam to testify on his behalf.

On the other hand, there are indications that defendant consistently, and rationally, opposed the presentation of a penalty defense, despite counsel's efforts to change his mind. Ultimately, on April 17, 2000, after the prosecution had rested its penalty case, counsel advised the court there would "probably" not be any defense evidence, but that counsel would be discussing that with defendant "over the next day and a half." Counsel indicated that "we do have evidence available, and we could use it if there is a change in mood." The court obtained defendant's agreement that counsel had advised him they were ready, willing, and able to present such evidence, and had "recommended to you that it be presented." Defendant also confirmed his understanding, as advised by the court, that his decision not to offer such evidence might result in the death penalty, and that if he precluded such evidence, he could not blame his lawyers or otherwise complain on appeal about its omission.

On April 19, 2000, Attorney Peters advised the court that, "for some time" he had been discussing possible penalty defenses with defendant, "and it has been his consistent wish not to defend himself for what he believes are valid moral reasons, and I believe that he is competent and he is thinking morally for himself." Peters indicated that defendant had threatened to "act out," such as by interrupting or overturning tables, if counsel acted contrary to his desires. Peters declared that under these circumstances, and especially considering that the available mitigation

41

was probably too weak to make a difference in the penalty determination, he was making a "conscious decision" to do as defendant asked.

The court then engaged defendant in another extended colloquy about his decisions not to present mitigating evidence or argument, and to testify personally. At the court's prompting, defendant again indicated he understood that counsel had mitigating evidence, were prepared to present it, and wanted to do so. Defendant confirmed he did not wish counsel to present such evidence. The court reminded defendant that, even if he offered no evidence, his lawyers, if allowed to speak on his behalf, could possibly "present different arguments to the jurors that might be favorable to you. And precluding [counsel] from that is another step towards the death penalty." Defendant separately confirmed he wished to preclude counsel from arguing the case.

Explaining his position on these issues, defendant insisted he was "not suicidal," but this was "something I need to do," something "important" and "right" that seemed "necessary." Defendant said he was "not looking at this [in] a way everyone else here is looking at it. I feel I am competent, I can do this, and I would appreciate my lawyer not to say anything."

Attorney Peters asked defendant whether, as Peters had told the court two days earlier, defendant intended to "act out" if counsel tried to present an argument. Defendant said he would do so, albeit reluctantly. On this basis, Peters again indicated he was making a "conscious decision" to proceed as defendant requested. Peters declared he would rather have defendant "say his [piece] to the jury" than display disruptive behavior to the jurors if counsel tried to overrule him.

In his testimony to the jury, defendant further explained his attitudes. He told the jurors he had asked his lawyers not to speak on his behalf, and he "appreciate[d]" their cooperation in that regard. He said that his personal code demanded "two eyes for every eye"; that under such a code, the maximum penalty

42

was "properly suited for this occasion" and was "the right thing for [the jurors] to do"; that "there's a price to pay for everything in life"; and that, "as part of the game," it was time he paid the price.

Thus, all record indications are that the omission of mitigating evidence was the result of defendant's clear, consistent, cogent, and articulately expressed wish to forego such evidence for moral and ethical reasons. There is no basis to conclude that this decision stemmed from any conflict of interest adversely affecting counsel's performance or that counsel, if unconflicted, would likely have acted differently.[12] Defendant essentially urges that counsel, and the court, were obliged to ensure defendant received a penalty defense whether he wanted one or not, but such is not the case. (E.g., *Lang*, *supra*, 49 Cal.3d 991, 1030-1031; see also pt. E, *post*.) Similar considerations apply to defendant's argument that conflict-free counsel would and should have overridden defendant's wish that counsel present no argument to the jury on his behalf. Defendant's contrary claims lacks merit.

### iv. *Defendant's testimony.*

Nor is there merit to defendant's claim that competent, unconflicted counsel could, should, and likely would have raised valid objections to defendant's testimony inviting the death penalty. A defendant, of course, has the

---

**12** Defendant urges that the adverse conflict-related influence on Attorney Peters's willingness not to present mitigating evidence in this case is circumstantially demonstrated by the fact that, in at least one other capital trial, Peters did present mitigating evidence against his client's wishes. (See *Douglas v. Woodford*, *supra*, 316 F.3d 1049, 1087-1090 [finding, despite client's lack of cooperation, that Peters conducted inadequate mental and social history investigation, and noting that Peters had presented some sociological evidence though client did not wish him to do so].) Unaware of the full circumstances in the other case, we are unwilling to draw the strained inference defendant proposes.

43

absolute right to give such testimony, even against his counsel's wishes. (*People v. Nakahara* (2003) 30 Cal.4th 705, 719 (*Nakahara*); *People v. Webb* (1993) 6 Cal.4th 494, 534-535 (*Webb*); *People v. Guzman* (1988) 45 Cal.3d 915, 961-963 (*Guzman*).)

Defendant cites a case decided long after his trial, *People v. Lancaster* (2007) 41 Cal.4th 50 (*Lancaster*), for the proposition that a defendant's testimony seeking a death sentence is irrelevant to mitigation of penalty, and may thus be properly excluded. Hence, he asserts, his counsel performed adversely, as the result of their conflict, by failing to raise a relevance objection to his testimony.

As *Lancaster* itself observed, however, that decision is inapposite. There, the defendant, ostensibly offering testimony in mitigation, sought to invoke political and racial considerations beyond his own case by comparing his " 'wrongful[ ] convict[ion]' " to that of Mumia Abu-Jamal, by suggesting that African-American men who stand up and fight for their rights are labeled " 'crazy,' " and by asserting that " '[t]hey experiment on black people.' " (*Lancaster*, *supra*, 41 Cal.4th 50, 101.) The trial court sustained the *prosecutor's* relevance objections to this testimony. We found no error, holding that the defendant's assertions impermissibly strayed beyond the pertinent factors in mitigation, i.e., the circumstances of his own offense and his own character and background. (*Id.*, at pp. 101-102, & cases cited.)

In doing so, *Lancaster* rejected the defendant's reliance on *Webb*'s statement that " 'a defendant's absolute right to testify cannot be foreclosed or censored based on content.' " (*Lancaster*, *supra*, 41 Cal.4th 50, 101-102, quoting *Webb*, *supra*, 6 Cal.4th 494, 535.) We indicated that "[this] statement must be understood in context; it addressed Webb's contention that the trial court should

44

not have allowed him to testify in favor of a death sentence." (*Lancaster*, *supra*, at p. 102.)[13] *Lancaster* thus made clear its holding did not undermine *Webb*'s premise that the defendant does have the right to proffer such testimony, even over his counsel's objections. Defendant's claim must be rejected.[14]

### c. Competence to stand trial.

Defendant urges his counsel's conflict resulted in their failure to ensure that he was not incompetent when he entered his "slow plea," when he was tried on the issue of penalty, and when he "effectively stipulate[d]" to the death penalty by presenting no mitigating evidence or argument and by taking the stand to agree he deserved execution. He asserts that his mental and emotional condition deteriorated seriously before and during the penalty proceedings as a result of the "draconian" conditions of his incarceration, that his behavior made this deterioration obvious, and that his counsel expressly realized his worsening mental and emotional state was interfering with his ability to assist in his defense. Nonetheless, he observes, his counsel assiduously avoided claiming he was incompetent. They did so, defendant posits, because their concerns about their personal involvement in the Nguyen murder conspiracy motivated them to curry favor with prosecutors by ensuring that defendant's penalty trial would not be postponed, and that he would promptly and predictably be sentenced to death.

---

[13] The quoted sentence was followed by a statement that "[t]he relevance of [the defendant's testimony in *Webb*] was not challenged." (*Lancaster*, *supra*, 41 Cal.4th 50, 102.) But this remark did not imply that *defense counsel* may raise such an objection against his own client's voluntary testimony.

[14] For similar reasons, we also find no merit to defendant's related argument that the trial court had a sua sponte duty to prevent defendant's testimony.

Defendant's argument in this regard is closely intertwined with his related claim that, based on the information available to it, the trial court erred by failing, sua sponte, to declare a doubt of his competence, and to order a hearing on that issue. Neither contention has merit.

### i. *Factual background.*

The incompetence-related claims stem from the following facts: From the moment of his federal arrest, defendant had been held in federal administrative segregation, with severe limitations on his communications privileges, under the terms of 28 Code of Federal Regulations part 501.3 (hereafter section 501.3). This provision authorizes the United States Attorney General to specify such conditions for a federal prisoner or detainee whose communications would present a substantial risk of death or serious bodily injury to persons. Defendant's federal plea agreement included his stipulation that such conditions would continue for the duration of his federal prison term.

After his federal conviction, defendant was kept in federal custody, at the Los Angeles Metropolitan Detention Center (MDC), under section 501.3 conditions, pending disposition of the instant capital murder charges. Control over his privileges resided with the federal district court. While he was housed in the MDC, and in violation of prior federal court orders, defendant was found in possession of a pen and pencils, and a number of forbidden written communications from defendant to other federal and state prisoners were intercepted. Certain of these communications included threats against the undercover officer who was instrumental in his federal conviction and an inmate in the Orange County Jail.

As a result of these incidents, the federal court in January 2000 imposed additional restrictions on defendant's already severe conditions of confinement.

Defendant was again prohibited from possessing writing materials; was essentially denied contact with other inmates and most prison personnel; was forbidden telephone communications except with counsel and, to a limited extent, with an elderly grandmother; and was allowed no visitors except his counsel and an aunt. As implemented by MDC staff, these restrictions resulted in defendant's placement in a sealed single cell, without radio, television, computer, or general (nonlegal) reading material. Two surveillance cameras kept constant watch on the cell's interior, and the cell's lights remained on 24 hours a day. For fear defendant would use his cell toilet as a means of inmate communication, he was not allowed to flush the toilet; he was required to summon a guard to perform this task.

Defendant's counsel labored repeatedly, in several fora, and with limited success, to obtain relief from these restrictions. In these efforts, counsel insisted that while defendant had not become incompetent, the isolation, stress, and sensory deprivation of his confinement were causing his emotional and mental condition to deteriorate, thus interfering with defense preparation for the trial.

As early as July 23, 1999, the day defendant entered his "slow plea" on guilt and the special circumstance, counsel advised the court of defendant's isolation and restrictions at the MDC, alluding to the "horrendous" emotional effects of these conditions. On July 30, 1999, counsel moved to continue the penalty trial date, then scheduled for August 9, 1999, to late September or early October 1999. Among other reasons, the written motion pointed to defendant's severe confinement conditions as then in effect, noting that "[t]his intensive confinement and isolation has a very negative impact on his mental health," "interfere[s] with [his] ability to organize his thoughts[,] and results in very hostile emotion."

On October 8, 1999, the court held a hearing to determine what issues required resolution before commencement of the penalty trial, then scheduled for

47

October 18. Among the matters addressed on October 8 were counsel's difficulties in transporting defendant's father and uncle from Vietnam, and courtroom security measures, including the possibility of physical restraints on defendant and screening procedures for other persons entering the courtroom. After discussion, the court announced a tentative decision that it would not "wand" prospective jurors, but would "wand" everyone else, i.e., "anybody that doesn't have a juror band," before allowing them to enter.

At this point, defendant interrupted, insisting that if "you wand my people, you are going to wand everybody," and that the court should not demonstrate "prejudice[ ]" by "separat[ing] my side from their side and all that other shit." When the court repeated that it intended to "wand" everybody who came into the gallery, i.e., observers, defendant said, "Fuck it, don't wand anybody. If you have a problem with me, say so." When the court responded that it had no problem, defendant continued, "I have done what I need to this court, and this court is going to rush me into this, what kind of bullshit is that? Fucking nothing is going to be done on the 18th, if we are going to say anything . . . ." When the judge told defendant to "get it out of your system," defendant retorted, "Play fucking games and we will play fucking games." At a subsequent hearing on October 18, 1999, after granting a defense motion to continue the trial, the court warned defendant that further outbursts like the one on October 8 would result in his removal from the courtroom for the duration.

On February 4, 2000, counsel informed the court of the increased federal confinement restrictions imposed in January. Counsel indicated that although defendant was psychologically "tough" and "strong," there was concern about the impact on him of "this virtual total isolation and lack of stimulation."

On February 25, 2000, the trial court attempted several times to obtain defendant's time waiver so the penalty trial could be continued from March 13,

48

2000, to April 3, 2000. Each time, defendant professed not to understand and said he needed time to talk to his lawyers. The court said "[g]o ahead," noting that defendant's principal counsel, Peters, was present. However, defendant insisted Peters was only one of his attorneys and indicated he "need[ed] two." During the proceeding, Peters explained that defendant "is very agitated this morning," likely because of the stress of his isolated confinement. Counsel asserted that defendant's condition "interferes with the ability to deal with him on a rational basis, but I am not saying he is 1368 [i.e., incompetent], if he was, I would tell you, of course, my obligation."[15]

On March 2, 2000, the trial court held an Evidence Code section 402 hearing on defendant's conditions of confinement and their effect on penalty trial preparation. Among other things, the court heard testimony from Dr. Thomas, the clinical psychologist retained by the defense to assist in determining defendant's competency and to help develop mitigating penalty evidence.

Assessing a recent visit with defendant, Dr. Thomas indicated that, because of his disappointment over the harsh federal sentencing of Victoria Pham, the withdrawal of his privilege to communicate with Pham, and the other conditions of his current confinement, he had become emotionally unstable and distrustful of the defense team. According to Dr. Thomas, defendant was "alternately enraged and kind of irrational," and his "emotional lability" was "impairing the process of the defense all the way around." Dr. Thomas cautioned that defendant "was certainly not out of touch with reality at all, and certainly not unable to discuss," but she agreed with defense counsel that "some aspects of this custodial situation

---

[15]    The reference is to section 1368, which sets forth the circumstances in which trial proceedings must be suspended pending a determination of the defendant's mental competence.

49

are causing [defendant's] emotions . . . , on a too frequent basis, to override his judgment."

Dr. Thomas acknowledged that defendant was intelligent, a violent sociopath, and a security risk whose own threats and rule violations had prompted the current restrictions. Indeed, she agreed with the prosecutor that, in his anger and frustration, defendant had "articulated feelings [of] wanting to kill people . . . includ[ing] prosecutors, witnesses, judges, [and] the lieutenant at the holding facility." Nonetheless, she opined that a continuation of the current confinement conditions would cause defendant's "ability to think clearly . . . to diminish," that "it is not going to get any better," and that she was "unable to move forward at this time" with her work for the defense. Later that same day, Attorney Peters represented in federal court that defendant was "not incompetent, but he's bumping up against that sort of thing."

At a pretrial hearing on March 29, 2000, Attorney Peters noted that, though he was prepared to put on mitigating penalty evidence, "we have for some time talked about putting no penalty evidence on." However, Peters cautioned, defendant "needs to be in a situation where he can make rational decisions about this" and indicated defendant's conditions of federal confinement were interfering with that process. Accordingly, Peters indicated, he intended to seek relief in the Ninth Circuit Court of Appeals from the federal district court's harsh confinement orders. Peters declared that "if I wanted to play games I could declare him 1368 or something, but I don't believe he is 1368, he is just in a very difficult situation."

On March 30, 2000, as promised, counsel filed a petition for writ of mandate and stay in the federal appeals court. (*Hung Thanh Mai v. United States District Court, Central District of California* (9th Cir. No. 0-70364).) The petition sought both an easing of defendant's confinement conditions and an order postponing the state capital penalty trial until his mental state improved and

50

stabilized. The petition asserted that while defendant was not incompetent, the psychological effects of his confinement had led to "a breakdown in the attorney client relationship," and to counsel's inability "to effectively communicate with [him]" The Ninth Circuit denied the petition on April 7, 2000.

On April 11, 2000, while selection of the penalty jury in the instant case was in progress, counsel filed a petition for mandate and stay in the California Court of Appeal, Fourth District, Division Three. (*Hung Thanh Mai v. Superior Court of Orange County*, G027290.) The petition sought a writ directing the trial court to order defendant's transfer from the MDC to the Orange County Jail pending the trial, and a restraint on further trial proceedings. According to the petition, defendant's conditions of federal confinement were so restrictive that he "has become increasing[ly] unstable, to a point where [he] is having great difficulty assisting his Counsel in the defense of his case." The petition cited Dr. Thomas's conclusions that, due to the "dehumanizing" circumstances of defendant's federal confinement, he "is becoming extremely volatile" and "cannot think clearly," and that, as a consequence, Dr. Thomas could not complete her penalty phase work. The Court of Appeal denied the petition the same day.

Jury selection was completed on the afternoon of April 11, 2000, and a jury was sworn. Prior to adjournment, after the jurors had been dismissed for the day, the court stated it had reviewed allegations in the Ninth Circuit writ proceeding that defendant's confinement conditions had caused him to become mentally unstable, such that his psychologist and attorneys were unable to prepare him for trial. The court said it wished "to note [its] observations for the record. The defendant has appeared in this courtroom on April 3rd, April 6th, April 10th, and April the 11th during jury selection. [¶] He has attentively followed roll call page by page. He has read questionnaires and reviewed prospective juror lists. He has made notes. He has appeared to consult with both his counsel concerning the lists

51

and questionnaires. I note that he has assisted Mr. Peters [defense counsel] in the exercise of peremptory challenges. [¶] He has not given an appearance of being nervous or upset. On the contrary, he has appeared to be rather calm and collected during this four-day time frame."

Counsel responded that, as confirmed by Dr. Thomas, defendant was experiencing various physiological symptoms, that he was overreacting to the smallest difficulties, and that the frustration produced by his confinement conditions meant he "can't be objective" in dealing with the defense team. Counsel also alluded to an "outburst" that morning which had required a delay until counsel could "calm [defendant] down."

On the other hand, counsel reiterated that "if [defendant] was 1368, I'd say that, I am not doing that because that would be a game, and I am not here to play games." "[A]ll we are saying," counsel insisted, was that the harsh confinement conditions were "bound to have an effect on somebody. Especially somebody facing the death penalty."

The next morning, April 12, 2000, the court noted, in a chambers discussion with counsel, that defendant had refused to come out of his cell at the MDC unless ordered by the court to do so. Once transported to Orange County and placed in the court's holding cell, the court observed, defendant "has been so loud that you can almost hear it in the courtroom."

Defense Counsel Peters indicated that defendant "has good reason to yell and scream," but was now calm. Counsel said his experience was that "[a]fter a point in time [defendant] is able to vocalize enough of his anger that he gets back to some sort of rationality." Counsel indicated defendant was upset because, several days earlier, he had seen the court clerk give coffee to the victim's family members, which made him feel he was not on neutral ground, and was also irate because his federal jailors had reneged on a promise to provide his lunch. Counsel

again indicated that defendant was not "1368," but was very upset and emotionally "volatil[e]," and had limited control over his behavior.

The court asked if defendant had complaints about a biased jury — a concern the bailiff had reported. Again the court indicated "the record should reflect I sat there and watched him exercise 20 peremptories through his counsel." Counsel said this was not the issue, and insisted that defendant was not trying to obstruct or delay. Counsel indicated that defendant well understood the reality of his legal situation and "knows what the [probable] outcome is," particularly since "we may put on no defense, and the evidence is overwhelming and awfully brutal." According to counsel, this reality, and defendant's isolated confinement, were precisely why small problems like the lunch issue became "magnified" and "drive [defendant] crazy." The court admonished counsel to remind defendant of the court's prior warnings that it would not tolerate his "disruptive conduct" and "foul language," and that further outbursts or disruption would result in his exclusion from the trial.

Proceedings briefly resumed, but almost immediately, the court met with counsel again in the hallway, out of defendant's presence. Defense Counsel Peters said defendant was concerned he might not be able to control himself in the courtroom, and had therefore asked to be shackled to prevent him from "act[ing] out." Peters explained that when defendant first met with counsel that morning, "he was talking how he was going to act up, that he had nothing to lose, which is true." Peters indicated there appeared to be grounds to accede to defendant's wishes "for his safety and my safety and [Cocounsel O'Connell's] safety." Still, Peters observed, while he did not "think [shackling] would be extremely prejudicial," he would try to dissuade defendant if he believed otherwise. The prosecutor indicated he had no objection to the request, and the court granted it, ordering that, while in court, defendant be restrained in "Martin waist chains."

Defendant was brought into the courtroom, and the jurors were summoned. As the court began to speak to the jury, defendant interrupted to say, "Next time you smile, throw a bigger smile my way." The following colloquy ensued: "THE COURT: Pardon me, Mr. Mai? [¶] THE DEFENDANT: I am speaking to the Burt family, they want to be smart asses. [¶] THE COURT: Don't be speaking to the Burt family. [¶] THE DEFENDANT: That's right."

As the court resumed addressing the jury, defendant again interrupted, stating that he "need[ed] a break" and "need[ed] to say something." When the court told him to be quiet, defendant implored Defense Counsel Peters to "speak up for me." After a discussion with defendant, Peters explained to the court that defendant "just wanted to be assured it was your order that he be here this morning." When the court responded that it had so ordered, defendant asked, "If you have the power to do that, why don't you have the power to do anything else?" The court advised defendant his counsel was speaking and warned defendant not to disrupt, whereupon defendant requested that Peters "ask [the court] if you have the power to do that, why don't you have the power to do other stuff?" Peters indicated he would make such an inquiry "[a]t the appropriate time," and the court warned defendant again against further disruption.[16]

A short while later in the morning of April 12, 2000, the prosecutor was outlining for the jury the evidence he expected to produce about the incident on the morning of Officer Burt's murder in which defendant brandished a handgun at another driver on the freeway. Defendant interrupted to say, "And I would do it

---

[16] Defendant's question is sensibly understood as asking why, if the court had the authority to order him transported from the MDC to attend the trial, it did not also have the authority to order that his conditions of confinement in that facility be relaxed.

again." The court ordered defendant to face toward the bench, and defendant responded, "Right."

On April 17, 2000, defendant disrupted the testimony of Mark Baker, who stated that, in September 1995, he witnessed a violent domestic altercation between defendant and Victoria Pham outside their apartment. When Baker testified that during the struggle with Pham, defendant hit her with his fist and she fell to her knees, defendant interrupted to shout, "Shut the fuck up, I think you are full of shit. If I fucking hit [her] with a fist, I would have knocked her fucking ass on the floor. What are you talking about?" When the court attempted to admonish defendant, he muttered, "You want to say something, speak the fucking truth," and "[b]ullshit."

Baker then testified that when he tried to stop the fight by telling defendant to " '[k]nock it off, you motherfucker,' " defendant went into his apartment and returned with a machine gun. At this point, defendant interrupted Baker's testimony to declare, "I should have killed your fucking ass is what I should have done, waste my goddamn time."

Shortly thereafter, automobile salesman Bachand testified that in June 1996, defendant and an accomplice abducted him at gunpoint during the test drive of a Honda Prelude. As noted above, defendant interrupted to shout that Bachand's testimony was "bullshit," because defendant had no incentive to steal a "piece of shit Honda," and that if defendant had been one of the carjackers, he would have "wasted [Bachand's] fucking ass." Moments later, when Bachand said defendant had warned that he and his companion were "Asian, Vietnamese Mafia," defendant interrupted to mutter, "Asian Mafia, stupid fuck." The court admonished defendant against further disruptions. Nonetheless, as Bachand continued his testimony, defendant overturned the counsel table and was removed to a detention area by the bailiffs.

55

On April 19, 2000, after the prosecution rested, defendant confirmed on the record that, despite his counsel's advice and wishes, he declined to present any mitigating evidence, opposed any effort by his counsel to speak in his behalf, and intended to testify about his opinion of the appropriate penalty. The court warned defendant that he was acting unwisely, that he could not appeal a resulting death sentence on grounds of incompetence or attorney error, and that these decisions were tantamount to suicide. In response, defendant insisted that he was "not suicidal," felt he was competent, and was "just doing the right thing that I feel that's necessary."

Defendant confirmed he would "act out" if counsel exercised their prerogative to present an argument, though "[i]t is not something I want to do." In response to a query from the court, defendant indicated he assumed his understanding with his counsel was "pretty firm." He iterated that "I just feel this is right, and I am hoping my lawyer agrees to that." On this basis, as noted above, counsel announced he would accede to defendant's wishes.

### ii.  Applicable law.

" 'Both the due process clause of the Fourteenth Amendment . . . and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. (§ 1367; *Drope v. Missouri* (1975) 420 U.S. 162, 181; *Pate v. Robinson* (1966) 383 U.S. 375, 384-386; *People v. Ramos* (2004) 34 Cal.4th 494, 507.) A defendant is incompetent to stand trial if he or she lacks a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — [or lacks] . . . a rational as well as a factual understanding of the proceedings against him.' " (*Dusky v. United States* (196[0]) 362 U.S. 402, 402; see also *Godinez v. Moran* (1993) 509 U.S. 389, 399-400;

56

*People v. Stewart* (2004) 33 Cal.4th 425, 513.)' (*People v. Rogers* (2006) 39 Cal.4th 826, 846-847.)" (*People v. Lewis* (2008) 43 Cal.4th 415, 524 (*Lewis*).)

Under both the federal Constitution and state law, the trial court must suspend criminal proceedings and conduct a competency hearing if presented with substantial evidence that the defendant is incompetent. (*People v. Elliott* (2012) 53 Cal.4th 535, 583 (*Elliott*); *People v. Ary* (2011) 51 Cal.4th 510, 517; *People v. Rogers*, *supra*, 39 Cal.4th 826, 847 (*Rogers*).) Substantial evidence of incompetence exists when a qualified mental health expert who has examined the defendant states under oath, and "with particularity," a professional opinion that because of mental illness, the defendant is incapable of understanding the purpose or nature of the criminal proceedings against him, or of cooperating with counsel. (*Lewis*, *supra*, 43 Cal.4th 415, 525; *People v. Stankewitz* (1982) 32 Cal.3d 80, 92.)

The defendant's demeanor and irrational behavior may also, in proper circumstances, constitute substantial evidence of incompetence. (*Rogers*, *supra*, 39 Cal.4th 826, 847.) However, disruptive conduct and courtroom outbursts by the defendant do not necessarily demonstrate a present inability to understand the proceedings or assist in the defense. (E.g., *Elliott*, *supra*, 53 Cal.4th 535, 583; *Lewis*, *supra*, 43 Cal.4th 415, 525-526; *People v. Medina* (1995) 11 Cal.4th 694, 735 (*Medina*).)

Counsel's assertion of a belief in a client's incompetence is entitled to some weight. But unless the court itself has declared a doubt as to the defendant's competence, and has asked for counsel's opinion on the subject, counsel's assertion that his or her client is or may be incompetent does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing. (§ 1368; *Lewis*, *supra*, 43 Cal.4th 415, 525; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1111-1112; *People v. Howard*, *supra*, 1 Cal.4th 1132, 1163-1164.)

57

By the same token, and absent a showing of "incompetence" that is "substantial" as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial. (*Rogers*, *supra*, 39 Cal.4th 826, 847.) " 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' [Citations.]" (*People v. Danielson* (1992) 3 Cal.4th 691, 727.)

### *iii. Discussion.*

Here, the record discloses no basis to conclude that counsel, driven by a conflict of interest, avoided seeking a competency hearing even though they believed defendant was incompetent. Nor are there grounds to infer that unconflicted counsel would likely have sought such a hearing. Indeed, as we explain hereafter, the record contains no substantial evidence of defendant's incompetence. Reasonably interpreted, it suggests counsel had a difficult client whose own calculated acts had resulted in his severe conditions of confinement, and whose frustration with the terms of his custody contributed to his anger, emotional volatility, distrust of counsel, and frequent lack of cooperation with them.

Counsel worked assiduously to ease these custodial conditions, urging in several fora, and by vigorous advocacy, that the resulting emotional toll on defendant was seriously interfering with defense efforts. But the record does not indicate that, contrary to counsel's consistent representations, they knew or should have known defendant's confinement had rendered him mentally *unable*, rather than emotionally *unwilling*, to help with his defense. We have frequently

recognized the distinction, as counsel apparently did, and have made clear that an uncooperative attitude is not, in and of itself, substantial evidence of incompetence. (See, e.g., *Elliott*, *supra*, 53 Cal.4th 535, 583; *Lewis*, *supra*, 43 Cal.4th 415, 526; *Medina*, *supra*, 11 Cal.4th 694, 735; *People v. Davis* (1995) 10 Cal.4th 463, 527-528.)

Significantly, the defense psychologist, Dr. Thomas, never declared "with particularity" that, as the result of a mental disorder or disability, defendant was unable to understand the proceedings or assist rationally in his defense. On the contrary, she acknowledged defendant's intelligence, indicated he was "not out of touch with reality at all," and agreed he was "certainly able to discuss" his legal situation. She suggested simply that the emotional instability stemming from his custodial status sometimes caused him to be "kind of irrational," affected his "ability to think clearly," and made it difficult to obtain his cooperation.

Counsel made similar representations in court, additionally noting that defendant understood the reality of his legal situation, and that once allowed to fully vocalize his anger and frustration, he was usually able to calm down and behave rationally. Counsel's concession that these circumstances did not amount to mental incompetence does not indicate counsel performed adversely as the result of a conflict of interest.

Defendant's "self-defeating" outbursts in court also do not constitute evidence that should and likely would have persuaded competent, unconflicted counsel to seek a competency hearing. These episodes demonstrated that defendant was often angry and resentful. But, as noted above, disruptive behavior is not substantial evidence of incompetence unless, by its particular nature, it casts doubt on the defendant's ability to assist in his or her defense. (E.g., *Elliott*, *supra*, 53 Cal.4th 535, 583; *Medina*, *supra*, 11 Cal.4th 694, 735.) Here, aside

59

from one incident of momentary confusion over a time waiver, defendant's courtroom demeanor, words, and conduct never indicated he did not understand the proceedings or was actually unable to assist his lawyers.

Indeed, defendant's anger and resentment were often connected in an understandable way to the trial proceedings. Thus, defendant protested when he thought he was being rushed to trial, or worried that the court's security measures might discriminate against "my people," or feared that court personnel were too solicitous of the victim's family, or reacted to witnesses who were giving damaging testimony against him. Defendant appeared capable of speaking up when he felt the need to consult with his lawyers in light of courtroom developments, and, at one point, he asked pertinent questions about the court's authority over the conditions of his confinement.

Moreover, after reviewing allegations that the conditions of defendant's confinement were seriously affecting his mental and emotional state, the trial court made clear on the record that its observations of defendant did not indicate incompetence. In particular, the court noted that defendant had calmly, but actively, participated in the extended process of jury selection, reviewing questionnaires and juror lists, making notes, and assisting counsel in the exercise of peremptory challenges. In sum, certain of defendant's behavior, as disclosed by the record, was rude, disruptive, and even menacing, but this behavior afforded no substantial grounds upon which unconflicted counsel should and likely would have pursued a claim of incompetence.

We reach a similar conclusion with respect to defendant's consistent and firmly stated intention to dispense with mitigating evidence, present no argument, and invite the jury to impose a judgment of death. A wish for the death penalty, and an insistence on presenting no penalty defense, are not, by themselves, evidence of incompetence sufficient to trigger competency proceedings. (E.g.,

60

*People v. Blair* (2005) 36 Cal.4th 686, 718; *People v. Ramos*, *supra*, 34 Cal.4th 494, 509.) Defendant made clear he understood the consequences of his decision, and he expressed his reasons coherently, even eloquently, to the jury. He explained he was motivated by reluctance to beg in court for sympathy or pity, by his personal code of "two eyes for every eye," and by his belief that, as "part of the game," the time had come to pay in full for his murder of Officer Burt. These well-stated moral sentiments in no way belied a mental ability to understand the proceedings and to assist in defending them. Defendant's attitude is not substantial evidence he was incompetent. Accordingly, it provides no ground to conclude that, as the result of a conflict of interest, counsel omitted to pursue a potentially valid incompetency claim.[17]

---

[17] Defendant notes Victoria Pham's claim that defendant became more violent after a near-fatal car accident, causing the defense psychologist to suspect brain damage. Citing *Pate v. Robinson*, *supra*, 383 U.S. 375, defendant urges that evidence of a head injury with subsequent irrationality and behavioral changes raises a "red flag" regarding competence, and constitutes, as a matter of law, sufficient evidence to require a competency hearing. But the scant evidence here does not remotely compare with the evidence found in *Pate* to raise a bona fide doubt of competence. Pate, convicted of killing his common law wife during an irrational episode, had a history of severe disturbance dating back to a childhood accident in which a brick fell on his head. His turbulent history included frequent episodes of bizarre behavior, hallucinations, and delusions, a stay in a psychiatric hospital, and the prior killing of his 18-month-old son, after which he tried to commit suicide. At his trial, four witnesses testified, without contradiction, that he was insane. This evidence, in combination, persuaded the high court that Pate should have received a full inquiry into his competence.

Here, by contrast, there is no real indication that defendant's sociopathic behavior, whatever its cause, had any logical connection to legal incompetence. Moreover, the possibility of injury-related brain damage does not, in and of itself, suggest inability to meet the legal standard for competence to stand trial. (See *Lewis*, *supra*, 43 Cal.4th 415, 525; *People v. Leonard* (2007) 40 Cal.4th 1370, 1415-1416.) Though offered for a different purpose, the testimony of the psychologist who suspected defendant's accident might have caused brain damage

*(Footnote continued on next page.)*

61

For similar reasons, we reject defendant's alternative argument that the trial court had a sua sponte duty to declare a doubt of his competence, and to initiate competency proceedings. As we have explained, the record discloses no substantial evidence that defendant was mentally incompetent. No qualified witness so testified; counsel's various descriptions of defendant's mental and emotional state did not equate to incompetence; and defendant's observable actions and decisions did not necessarily suggest he lacked the requisite ability to participate rationally in his defense. Moreover, the trial court's day-to-day observation of defendant's demeanor and conduct, including his episodes of disruptive behavior, did not cause the court to doubt his competence — a fact the court felt obliged to place on the record not once, but twice. Under these circumstances, the court did not err by taking no action to determine whether defendant was competent.

### d.   *Advice to defendant.*

Finally, defendant points to comments by Attorney Peters, at various points in the record (never in the jury's presence), expressing the pessimistic view that there was little realistic hope at either the guilt or penalty stages. Defendant characterizes certain of these remarks as suggesting counsel's personal view that defendant deserved the death penalty. Such comments, defendant asserts, are circumstantial evidence that counsel, burdened by their conflict of interest, advised

---

*(Footnote continued from previous page.)*

suggested strongly that he was *not* mentally unable to understand the proceedings and assist rationally in his defense. Nothing in *Pate* convinces us that effective, unconflicted counsel should and likely would have used the information about defendant's auto accident to raise a reasonable doubt of his competence.

defendant incompetently by overstating the hopelessness of his case, by suggesting he had no viable defenses,[18] and by urging him to submit the guilt and special circumstance issues and forego the presentation of mitigating evidence and argument at the penalty phase. Further, defendant asserts, Attorney Peters violated his duties as an advocate by publicly stating his personal view that defendant deserved the death penalty. (Citing, e.g., *U.S. v. Swanson* (9th Cir. 1991) 943 F.2d 1070, 1074; *Osborn v. Shillinger* (10th Cir. 1988) 861 F.2d 612, 626; *State v. Holland* (Utah 1994) 876 P.2d 357, 358-361 & fn. 3.)

We are unconvinced. First, as defendant concedes, the record does not, for the most part, disclose what advice counsel privately imparted to him. If anything, however, the record indicates defendant himself insisted throughout the proceedings, for reasons he cogently explained to the penalty jury, that once he was brought to justice, his personal code of honor obliged him to pay for his murder of Officer Burt without any effort to seek sympathy or mercy in a court of law. The record also contains numerous indications that his attorneys did attempt to get him to change his mind,[19] but that he virtually coerced them to agree to his wishes by threatening to engage in inflammatory disruptions before the jury if they tried to overrule him.

Second, as counsel knew, there was indeed overwhelming evidence that defendant gunned down a CHP officer during a routine traffic stop, ultimately executing the officer by firing a bullet into the victim's head at close range while

---

[18]    In reality, defendant asserts, he had a strong defense to the peace officer special circumstance, on grounds he was stopped and detained illegally by Officer Burt. He further urges that a fully developed mitigating case, based on his escape from Vietnam, his cultural difficulties in adjusting to life in the United States, and his possible brain damage, might well have persuaded a jury to spare his life.

[19]    As Attorney Peters stated at the hearing on the automatic motion to modify the death verdict, "we spent hundreds of hours talking about that topic."

he lay helpless. Counsel could also reasonably conclude that a fact finder, whether court or jury, would likely be unpersuaded by a special circumstance defense that questioned the legality of the traffic stop. And, though a death judgment was not inevitable, neither the facts of the capital crime nor the violent and obstreperous personality defendant displayed during the penalty trial were likely to engender sympathy with a jury deciding the issue of life or death.

Under these difficult circumstances, the record discloses no ground to conclude that counsel rendered adverse or deficient assistance if they advised defendant to preserve credibility at a penalty trial by allowing his counsel to tell the penalty jury he "had done the right thing" by not contesting guilt. Similarly, if counsel suggested defendant should reserve for appeal the argument that the preliminary hearing transcript contained insufficient evidence he was illegally detained by the murder victim, this advice, too, was not adverse or incompetent. Nor, on the basis of the record before us, did counsel perform adversely if they offered the candid and reasonable prediction that a death judgment was likely, regardless of any case in mitigation that could be put forward.

Finally, we do not interpret Attorney Peters's comments on the record as concessions that *he personally* believed defendant deserved to die. Rather, they appear as attempts, on behalf of a client who had resisted all efforts to portray him sympathetically, to urge that, in the end, he was at least taking responsibility for his actions, did not seek to avoid the consequences of his murder of Officer Burt, and thus was not wholly irredeemable.

For all the reasons set forth above, we conclude the record fails to demonstrate that defendant's trial counsel performed adversely as the result of a conflict of interest, or that they otherwise rendered constitutionally inadequate assistance. As a result, we need not, and do not, address defendant's extensive argument that a "presumption of prejudice" should apply to counsel's adverse

64

performance arising from the type of conflict defendant asserts here. (See, e.g., *Mickens*, *supra*, 535 U.S. 162, 171-174; *Doolin*, *supra*, 45 Cal.4th 390, 418, fn. 20.)[20]

## B. Sufficiency of special circumstance evidence.

Defendant contends that, in violation of "state law and the Eighth and Fourteenth Amendments," the evidence supporting the special circumstance finding that he intentionally killed a police officer engaged in the performance of duty was legally insufficient. We disagree.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; see also, e.g., *People v. Prieto* (2003) 30 Cal.4th 226, 245; *People v. Farnam* (2002) 28 Cal.4th 107, 142-143.) In the instant case, these inferences are aided by the presumption, applicable to police officers except in the case of a warrantless *arrest*, that official duty was regularly performed. (Evid. Code, § 664; see, e.g., *Davenport v. Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 141.)

---

[20] As the high court made clear in *Mickens*, and as defendant acknowledges, a "presumption of prejudice" may apply to certain kinds of attorney conflicts, including the active representation of competing interests, but even then, the presumption does not apply until the defendant has demonstrated *adverse performance* related to the conflict. (See *Mickens*, *supra*, 535 U.S. 162, 171-174.)

As indicated above, the preliminary hearing evidence indicated that the traffic stop occurred in the early evening of July 13, 1996. Defendant's associate, Chang Nguyen, testified that defendant gave him the following account of the circumstances leading to the victim's death: Officer Burt stopped defendant for failure to have his headlights on. Defendant did not show the officer his own driver's license, but instead gave a false name. The officer learned that the driver's license in that name was suspended. He thereupon advised defendant he would have to tow the car, but first must perform an inventory search of the vehicle. The officer opened the car's trunk, looked inside, and told defendant he was under arrest. Defendant, aware that he had crime evidence in the trunk and determined not to leave a witness to a third strike offense, then proceeded to shoot the officer.

Defendant's insufficient-evidence claim proceeds on the premise that, in order for the peace officer special circumstance to apply, the officer must have been performing his duties "lawfully" at the time he was killed. (See pt. A.4.a, *ante*.) Defendant does not seriously argue the record lacks evidence the officer's actions *during* the traffic stop were lawful. However, he urges the record of the preliminary hearing, on which the special circumstance finding was made, fails to include evidence from which a rational fact finder could conclude beyond reasonable doubt that Officer Burt had legal cause to stop and detain him at the outset.

Because Officer Burt's death at defendant's hands prevented the victim from explaining, in sworn testimony, the reason and basis for the stop, the only evidence on that issue came from Nguyen, who testified — without objection from the defense — that defendant said "he was driving and he thought he had his light [*sic*] on, but he got pulled over by [a] California Highway Patrolman for not having his light [*sic*] [on]." Defendant's statement to Nguyen was amply

66

sufficient to allow a fact finder — here, a learned trial judge — to infer, first, that failure to have his headlights on was the reason defendant was stopped; second, that he understood he *should have had* his lights on; and third, that he *actually did not* have them on. No evidence disputed or contradicted these inferences.[21]

Other evidence also supports them. In 1996, as now, the law required a motor vehicle's headlights to be on when the vehicle was driven between one-half hour after sunset and one-half hour before sunrise. (Veh. Code, §§ 280, 24400, 38335.) Bernice Sarthou testified at the preliminary hearing that she observed the traffic stop involving defendant and Officer Burt as she pulled into an adjacent

---

[21]     Defendant concedes his account to Nguyen of his own actions leading to the shooting of Officer Burt were declarations against interest, and were thus not made inadmissible for their truth by the hearsay rule. (Evid. Code, § 1230.) However, he asserts that Officer Burt's "no headlights" statement to him, as related to Nguyen, was not offered by the prosecution for its "truth," but for the "non-hearsay purpose of explaining and putting into context [defendant's] admissions." This claim is based on the prosecutor's response to a defense "multiple hearsay" objection to *later* testimony by Nguyen that Officer Burt advised defendant he would have do an inventory search on defendant's car. The prosecutor said he understood that "the layer from the officer to the defendant is not for the truth of the matter." The court agreed, indicating that evidence of Officer Burt's "inventory search" statement was presented to make the defendant's admissions "meaningful," and overruled the objection. However, as noted, the defense made no hearsay objection when Nguyen testified defendant said that Officer Burt stopped him because his headlights were off. Moreover, the hearsay rule did not make inadmissible Officer Burt's statement as evidence of his intent and purpose — i.e., his state of mind — in stopping defendant. (Evid. Code, § 1250, subd. (a)(2).) And to the extent Officer Burt's out-of-court "no headlights" statement was "testimonial" (see *Crawford v. Washington* (2004) 541 U.S. 36), the doctrine of "forfeiture by wrongdoing" precludes defendant from claiming his constitutional rights were violated because he was unable to confront, in court, an out-of-court declarant whom he killed, as the undisputed evidence shows, to prevent the declarant from appearing as a witness against him. (See *Giles v. California* (2008) 554 U.S. 353, 376-377.)

restaurant around 8:30 p.m. on July 13, 1996. As noted above (*ante*, fn. 8), we have taken judicial notice of the indisputable fact that sunset occurred in Fullerton on that date at 8:04 p.m. On this evidence, a rational fact finder could infer that, at the time the stop occurred, dusk was approaching, and that Officer Burt thus reasonably concluded the law required defendant's headlights to be on.

Defendant stresses Sarthou's insistence, on both direct and cross-examination, that when she first observed defendant and Officer Burt, she was wearing her sunglasses because the sun had not yet set. But this testimony contradicted Sarthou's equally consistent time estimate, as compared with the actual time of sunset on July 13, 1996. It was also inconsistent with defendant's statement to Nguyen that "he thought he had his light[s] on." As between Sarthou's contradictory recollections, and considering the totality of relevant evidence, the fact finder was not obliged to credit Sarthou's "sun was still up" testimony. Instead, the fact finder could believe her assertion she first observed the traffic stop at a time that was, in fact, approximately one-half hour after sunset. There was sufficient evidence to support a determination that Officer Burt acted lawfully when he stopped defendant's vehicle on July 13, 1996.[22]

---

[22] Evidence adduced at the penalty trial does not alter these conclusions. Sarthou testified, consistently with her preliminary hearing account, that she observed the traffic stop around 8:30 p.m. and was wearing sunglasses. Other witnesses to the traffic stop gave time estimates that varied between 8:00 p.m. and 8:30 p.m. Eyewitness Benjamin Baldauf, who agreed 8:30 was "about the right time frame," also said the lighting was "long on shadows, just before dark". A CHP dispatcher testified that he received a "license check" call from Officer Burt around 8:30 p.m.

### C. Claim of biased juror.

Defendant urges that his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and under article I, section 16 of the California Constitution, were violated by the seating of Juror No. 12, who, he asserts, was actually biased on the issue of penalty. Defendant acknowledges that his lawyers did not challenge Juror No. 12 for cause, use a peremptory challenge to excuse the juror,[23] or express dissatisfaction with the jury as sworn. (E.g., *People v. Carasi* (2008) 44 Cal.4th 1263, 1290; *People v. Bonilla* (2007) 41 Cal.4th 313, 339; *People v. Hillhouse* (2002) 27 Cal.4th 469, 487; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 & fn. 4 (*Crittenden*).) Nonetheless, defendant contends the state is constitutionally disentitled to carry out a death judgment joined by a biased juror. Alternatively, he asserts that his counsel's failure to challenge Juror No. 12 for cause, or to use a peremptory challenge against this juror, constituted ineffective assistance. In any event, he insists the court should have excused the juror sua sponte.

However the issue is framed, we are unpersuaded by the merits of defendant's argument that Juror No. 12 demonstrated actual penalty bias. Hence, defendant's claim must be rejected.

" 'The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence. . . . If the death penalty is imposed by a jury containing even one juror who would vote automatically for the death penalty without considering the mitigating evidence, "the State is disentitled to execute the sentence." [Citation.]' " (*People v. Boyette*

---

[23] It is undisputed that defendant exhausted his peremptory challenges.

(2002) 29 Cal.4th 381, 416 (*Boyette*), quoting *People v. Weaver* (2001) 26 Cal.4th 876, 910 (*Weaver*).)

But strong views for or against the death penalty do not necessarily provide a basis to excuse a prospective juror on the ground of actual bias.  Instead, " 'the law permits a prospective juror to be challenged for cause [as biased on the issue of capital punishment] only if his or her views [on that subject] "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath.'  (*People v. Blair* (2005) 36 Cal.4th 686, 741, quoting [*Wainwright v.* ]*Witt* [(1985)] 469 U.S. [412,] 424.)"  (*People v. Martinez* (2009) 47 Cal.4th 399, 425 (*Martinez*).)  That a prospective juror might weigh the aggravating and mitigating evidence in light of his or her death penalty views is not necessarily a ground for exclusion.  Opinions about the death penalty may disqualify a penalty juror only if they would prevent the juror from engaging in the weighing process and deliberating the issue of penalty.  (E.g., *Martinez*, *supra*, at p. 427; *People v. Stewart* (2004) 33 Cal.4th 425, 446.)

A prospective juror's responses on these issues may be conflicting or ambiguous, or may demonstrate understandable confusion about the complexities of death penalty law.  Such responses do not necessarily require, or justify, a juror's excusal for bias.  (E.g., *Boyette*, *supra*, 29 Cal.4th 381, 416; *Weaver*, *supra*, 26 Cal.4th 876, 910; *People v. Fudge* (1994) 7 Cal.4th 1075, 1094.)  And even jurors with very strong views about the death penalty are qualified to serve if they affirm they will set those views aside, as necessary, in favor of applying the law and instructions.  (E.g., *Martinez*, *supra*, 47 Cal.4th 399, 431; *Lewis*, *supra*, 43 Cal.4th 415, 488.)

Juror No. 12's answers on the juror questionnaire indicate he harbored strong pro-death views, both generally and about this particular case.  On the other

70

hand, he asserted his belief that he could set aside his feelings, follow the court's instructions, and be a fair and impartial juror.

In response to a question about how, if at all, he had become familiar with the case, Juror No. 12 indicated his wife's cousin was a Fullerton fireman who had been called to the shooting scene and tried to save Officer Burt. Asked what opinions, based on this information, he had formed about the appropriate sentence, Juror No.12 answered, "My opinion — death sentence." On the other hand, Juror No. 12 answered "yes" to the question whether he could set aside his prior knowledge of the case and decide it on the evidence presented in court "and the law given to you at the conclusion of the case." To the question whether he could set aside any preformed opinions about the case and decide it on the evidence and law presented during trial, Juror No. 12 responded, "I think so."

In response to a question whether he had recently followed other criminal cases in the news media, Juror No. 12 answered "yes," and explained he had followed "[t]he appeals to let the woman in Texas be excused from [the] death penalty because she found God." A follow-up question inquired whether a case or cases the prospective juror had followed might affect his or her ability to be a fair and impartial juror. Juror No. 12 checked "yes" and indicated, "[if] defendant said he'd found God and should be spared for that reason."

Following these questions and answers, the questionnaire included a section titled "Attitudes About the Death Penalty." This section was prefaced by an extended description of the nature of a capital penalty trial. The preface explained that the jury was to determine the appropriate penalty by "weighing" various aggravating and mitigating ("bad and good") things about the crime, the defendant, and his background, "including a consideration of sympathy." It admonished that the weighing process was not quantitative, but qualitative, and that, to fix the penalty at death, the jury must be persuaded the aggravating factors

71

"are so substantial in comparison with the mitigating factors" that death, rather than life without parole, was warranted.

The questionnaire than asked whether, "[b]ased on the above," the prospective juror's views would cause him or her to automatically vote for life or death. Juror No. 12 answered "no" in each case. When queried as to his "GENERAL FEELINGS about the death penalty," Juror No. 12 responded, "I'm for it." Asked whether he thought the death penalty was used too seldom, too randomly, or too often, Juror No. 12 stated, "Too many appeals that take too long." Asked whether he could set aside his personal feelings about what the law ought to be and follow the court's instructions, Juror No. 12 checked "yes," and wrote, "I'm for the death penalty but if [the] court proved to me that defendant should be spared death — I might not vote death."

The next questionnaire section was titled "Penalty Trial – Factors to Consider." The single question in this section was preceded by an explanation that persons selected to serve as penalty jurors would receive instructions listing the relevant factors in the penalty determination. These factors were then set forth, including "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime (and any sympathetic or other aspect of the defendant's character and record) that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." The questionnaire then asked if the prospective juror felt that any of the listed factors should "never" be considered in determining the appropriate punishment. Juror No. 12 answered "no."

Juror No. 12 expressed similar attitudes during oral voir dire.[24]  While he was in the jury box during jury selection, the court posed three questions, addressed to the group in the box.  Paraphrased, these questions were whether the prospective juror (1) could personally vote for death if he or she believed that was the appropriate punishment, (2) could personally vote for life without parole if he or she believed this was a case where death was not appropriate, and (3) would carefully consider both options before deciding.  The court then asked several prospective jurors individually, including Juror No. 12, how they would respond to those questions.  Juror No. 12 answered, "Yes to all three."

The court addressed Juror No. 12 about his "I think so" response to the questionnaire inquiry whether he could set aside preformed views and decide the case on the evidence and the law.  "Can you assure counsel and [me]," the court asked, "that you can set aside any preconceived opinion and decide this case —? " Juror No. 12 interjected, "I think I can, if they can give me a good reason that somebody shouldn't be put to death, I believe I would vote in that direction."  The court then asked, "So your position is that they have to prove why somebody should not be put to death?"  Juror No. 12 answered, "Uh-huh."

Shortly thereafter, the court addressed general remarks to the panelists, including Juror No. 12, who were in the jury box.  The court indicated that it would provide certain instructions throughout the trial and at its conclusion.  "It is

---

[24]    In response to the court's biographical inquiries during voir dire, Juror No. 12 indicated that he lived in Buena Park, was 43 years old and single, and had completed high school and "a couple years in college."  He stated he had worked at Disneyland for the past 24 years, and for the Orange County Republican Central Committee "for a couple years before that."  Juror No. 12 also indicated he had an uncle who was a retired Los Angeles County deputy sheriff, and another uncle "who spent about five years in the Whittier police force . . . back in the late 1960's."

important," the court declared, "that I have your assurance that you will follow my instructions and rulings on the law and will apply that law to this case. [¶] [To] [p]ut it somewhat differently, whether you approve or disapprove of the court's rulings or instructions, it is your solemn duty to accept as correct these statements of the law. You may not substitute your own idea of what you think the law ought to be. [¶] Is there any member of the panel that will not follow the law as it is given to you in this case?" Juror No. 12 made no response indicating he would not do so.

Continuing its general inquiries, the court asked the panelists in the jury box, including Juror No. 12, whether "any of [their] close friends or relatives [had] ever served as a juror on a capital case; death penalty case." Juror No. 12 raised his hand and stated, "My immediate boss at work that I have known for about 20 years, just did one out in Riverside County." The court asked whether this individual had discussed the Riverside County trial with Juror No. 12 after it was over. Juror No. 12 declared, "He said that it, you don't know what it is like, you have an opinion about it until you get there and actually have to make that decision, you just don't, you can't understand it."[25]

After further questions directed to various panelists sitting with Juror No.12 in the jury box, the court again asked the group as a whole, "Does any juror know of any other reason, or has anything occurred during this questioning period that might make you doubtful that you would be a completely fair and impartial juror

---

[25] Asked by the court if anything Juror No. 12 discussed with the Riverside County juror about the latter's experience "would have any bearing on how you would decide this case," Juror No. 12 answered, "No." But considered in the context of his answer to the preceding question, the negative response indicates that these discussions had not reinforced any preconceived pro-death attitudes on Juror No. 12's part, and, if anything, had instead influenced him to keep an open mind.

in this case, or why you should not be on this jury? If there is, it is your duty to disclose the reason at this time." Juror No. 12 did not respond.

Attorney Peters asked Juror No. 12 about his questionnaire reference to delays in the capital penalty system. Peters inquired whether "that [is] going to leak over into the facts of this case, the law involved in this case." Juror No. 12 said, "I don't think so." Peters suggested, "That's more of a political problem than anything else?" Juror No. 12 answered, "Yeah." Peters queried whether Juror No. 12 could "weigh the aggravating and mitigating, whatever those turn out to be, and render a fair verdict." Juror No. 12 responded, "I think so." Without further questions to Juror No. 12, the defense passed the panelists in the box, including Juror No. 12, for cause.

The prosecutor asked Juror No. 12 whether, "[f]rom what you heard about the case, what it is about, a police officer victim, do you think you could sit and be that kind of juror we were talking about who can consider both [penalties], who can accept the death penalty and vote or impose either one." Juror No. 12 answered, "Yes." When the prosecutor then posited that "[y]ou think you can do that?," Juror No. 12 responded, "Yes, I do." Without further questions to Juror No. 12, the prosecution passed the panelists in the jury box, including Juror No. 12, for cause.

Under these circumstances, Juror No. 12's written and oral responses did not demonstrate, as a matter of law, that his death penalty views would " 'prevent or substantially impair' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*Crittenden*, *supra*, 9 Cal.4th 83, 121.) Juror No. 12 expressed unequivocal general support for the death penalty, conceded his pretrial impression that death was appropriate in this case, and asserted he started from the perspective that the defense had the burden of proving otherwise. However, advised at several points that he must follow the law and

instructions regardless of his personal views, and must frankly disclose if he felt unable to do so, he consistently indicated that he could and would subordinate his views, carefully weigh and consider the aggravating and mitigating evidence as instructed, vote for either death or life without parole as appropriate, and sit fairly in accordance with the juror's oath. He further noted the insight of a colleague who had recently served as a capital juror that, whatever one's preconceived notions, it was impossible to understand the solemn realities of that role until one had experienced it.

The record thus fails to establish that Juror No. 12 was a biased juror. This conclusion disposes of defendant's contentions that the trial court had a sua sponte duty to excuse Juror No. 12, and that his counsel was incompetent for failing to challenge this juror.

The first of these claims fails for the following reasons: Had the trial court — which was able to observe Juror No. 12's demeanor and evaluate his credibility under voir dire questioning — denied a challenge for cause on the ground of penalty bias, its ruling would have been upheld on appeal as supported by substantial evidence, and within the court's discretion. (E.g., *Martinez*, *supra*, 47 Cal.4th 399, 426; *Lewis*, *supra*, 43 Cal.4th 415, 483; *Weaver*, *supra*, 26 Cal.4th 876, 910.) If the court was not required to sustain a bias challenge against Juror No. 12, it was certainly not obliged, on its own motion, to excuse this juror for bias.

By the same token, defendant cannot show on the appellate record that competent counsel should and would have challenged Juror No. 12 on this ground. (*People v. Lucas* (1995) 12 Cal.4th 415, 485.) So far as appears, counsel could reasonably conclude there was no merit in such a challenge. (*Ibid.*) Nor does the record demonstrate the absence of any plausible tactical reason for counsel's failure to raise the issue on the chance of a favorable ruling. Counsel, who were

also able to observe Juror No. 12's personality and demeanor, might have formed the impression that, despite his views, this panelist would indeed perform fairly, and would not be a liability as a sitting juror. (*Ibid.*) We find no basis to reverse the penalty judgment.

### D. *Wheeler/Batson* **claim.**

Defendant urges his state and federal constitutional rights to a jury drawn from a representative cross-section of the community, to equal protection of the law, and to a fundamentally fair and reliable trial (U.S. Const., 5th, 6th, & 14th Amends., Cal. Const., art. I, §§ 7, 16) were violated when the trial court erroneously denied his objection, under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), that the prosecutor had used peremptory challenges to excuse African-American prospective jurors for racially discriminatory reasons. (*Wheeler/Batson* claim). We reject the contention.

#### l. *Facts.*

During jury selection, defense counsel objected that the prosecutor "[had] excused all the Black jurors." The court asked if counsel was making a "Wheeler motion," and counsel replied, "Yes."[26] Defense counsel and the prosecutor agreed the prosecutor had exercised peremptory challenges to excuse prospective jurors M.H., P.F., and L.P., the only three African-American members of the jury pool. The court asked the clerk to retrieve the questionnaires of these panelists. While the clerk was doing so, the court tentatively found a prima facie showing of discriminatory intent.

---

[26] The reference to *Wheeler* sufficed to preserve defendant's claim under *Batson* as well. (*Vines*, *supra*, 51 Cal.4th 830, 847, fn. 7; *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

77

On reflection, the court backtracked from that finding. It suggested the defense was required to demonstrate a "strong likelihood" of discrimination in the excusal of these prospective jurors, and expressed doubt such a likelihood was established by the mere fact that "all three [were] of the same racial group." Defense counsel responded there was further "circumstantial evidence" of discrimination, i.e., counsel's recollection that, except for their race, these prospective jurors were indistinguishable from others the prosecution had failed to excuse. Ultimately, though the court found the prima facie issue "marginal," it asked the prosecutor to give his reasons for the excusals.

As to M.H., the prosecutor indicated, "[M.H.] is single. She has no children. She is younger than the juror I prefer. She is in her 30's. She is also, her attitude regarding the death penalty was personal and emotional, not philosophical. She was the one who talked about, if it was my family I could understand it. But primarily the reason [is] she is young, single and no children. There [are] no other jurors on the jury presently who fit that pattern."

As to P.F., the prosecutor stated that "she is also younger than I want, in her 30's. She had a very casual attitude and dress. She said that, well, in her questionnaire [the death penalty] was appropriate only where there was a pattern of violent conduct, which is not the law. And she didn't seem particularly interested in the proceedings. And when I was talking to her she seemed rather bored with my questions, and with [defense counsel's] questions."

As to L.P., the prosecutor declared that "I had two reasons for challenging her. Her present occupation. She is a social worker. And I generally try not to have social workers. I generally will use a peremptory on social workers unless there is a reason not to. She also said that she couldn't vote for the death penalty unless it was proved, the facts were proved beyond a shadow of a doubt, which is

78

not the law either.  So I felt she might be holding the People to a stronger burden on some of the facts, particularly the other acts that are alleged."

As additional explanation pertaining to all the prospective jurors at issue, the prosecutor advised that "I grade [prospective jurors] on a system of one to ten and before seeing the jurors I graded [L.P.] a three, [P.F.] a three plus, and . . . [M.H.] a four."

At this point, defense counsel interjected, "I just want to point out that [Juror No. 12] is also unmarried."  Apparently confused by counsel's remark, the court indicated, "I think we are still doing peremptories, aren't we?"  Defense counsel responded by saying, "I know.  I am finding everything, I am a lawyer, I am finding every —," whereupon the court asked, "Anything further?"  The prosecutor said, "No."  The court asked whether the matter was submitted, and defense counsel said, "Yes."

The court thereupon ruled as follows:  "Well, the court finds that no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral, and on those grounds the court will deny the Wheeler motion."

### 2. *Applicable law.*

" ' "Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias." ' [Citation.] Recently, 'the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made.  "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.

[Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citations.]" ' (*People v. Cornwell* (2005) 37 Cal.4th 50, 66-67; see also *People v. Mills* (2010) 48 Cal.4th 158, 173.)

" ' " '[A] defendant satisfies the requirements of *Batson*'s first step by providing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.] [¶] In determining whether the defendant ultimately has carried his burden of proving purposeful racial discrimination, 'the trial court "must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . .' [Citation.]" ' (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.) '[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.' " ' (*People v. Stanley* [(2006)] 39 Cal.4th [913,] 936.)

" 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." '

(*People v. Lenix* (2008) 44 Cal.4th 602, 613-614.)"  (*Vines*, *supra*, 51 Cal.4th 830, 848.)[27]

---

[27] The concurring opinion urges that, when the trial court has failed to explain in detail why it is accepting the proffered reasons for a challenged excusal, we owe the court's ruling no deference, but must ourselves examine the record in detail and determine independently whether the proffered reasons for the excusal were likely sincere.  As in a recent prior opinion on this subject (*People v. Williams* (2013) 56 Cal.4th 630, 715 (dis. opn. of Liu, J.)), the concurring opinion's author concedes that in concluding otherwise,we adhere to our well-established precedent.  (Conc. opn. of Liu, J., at p.  7.)

Our practice does not indicate, as the concurring opinion suggests, insensitivity to claims that a peremptory excusal has been employed for a discriminatory reason.  On the contrary, it honors the principles that should and do attend the evaluation of such claims.  A party has an absolute right, within statutory limits, to excuse a prospective juror for any nondiscriminatory reason, however subjective, that gives the party concern about the juror's suitability.  We presume this right is exercised in good faith, and the burden is always on the party claiming discrimination to establish it.  When the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we also assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility.  Finally, we recognize that the trial rather than the appellate court is best suited to determine, under all the relevant circumstances, whether the proffered reasons are likely the real ones.

Deference to the trial court in such a case, even in the absence of a detailed ruling, hardly constitutes "a 'don't ask, don't tell' approach to appellate review." (Conc. opn. of Liu, J., *post*, at p.  25.)  In a stage three *Wheeler/Batson* analysis, the trial court rules only after the party who exercised the challenged excusal *was* asked, and *did* tell, the reasons for this action.  Here, the trial court accepted explanations that are facially permissible, inherently plausible, and factually supported, and defendant cites no substantial evidence of pretext.  Under such circumstances, there is no reason on appeal to suspect a dereliction of duty by the trial court, or to *reverse* the presumption that the excusals were exercised legitimately, simply because the trial court did not "tell" its reasons in detail.  Accordingly, as we have previously indicated, our past precedent will "guide us until the United States Supreme Court articulates a contrary rule."  (*Williams*, *supra*, at p. 653, fn. 21.)

Appellate review of a step three finding of nondiscriminatory intent is also informed by the principle that "the defendant's burden at the third stage of a *Wheeler/Batson* hearing is to show the prosecutor excused prospective jurors for discriminatory reasons [citation], not merely that some of the nondiscriminatory reasons offered by the prosecutor are not supported by the record." (*People v. Taylor* (2009) 47 Cal.4th 850, 891 (*Taylor*); see *People v. McKinzie* (2012) 54 Cal.4th 1302, 1322.)

Here, it is not clear the trial court ultimately found, in step one, that defendant had made out a prima facie case. Moreover, insofar as the court declined to make such a ruling, it appears to have relied on its belief that a prima facie case required the showing of a "strong likelihood" of discrimination. Intervening high court authority has held that such a standard is too demanding for federal constitutional purposes. (*Johnson v. California* (2005) 545 U.S. 162, 170 [prima facie burden is simply to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred"].)

However, as noted, the court nonetheless proceeded to step two by asking the prosecutor to explain his reasons for the challenged excusals. The prosecutor did so, and the trial court then made a ruling, pursuant to step three, that the reasons expressed were valid. Under these circumstances, we too may simply proceed as though this is a step three case, analyzing whether the trial court properly accepted the race-neutral reasons given by the prosecutor. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1105-1106; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1010; *People v. Ward* (2005) 36 Cal.4th 186, 199-201.)

*3. Discussion.*

Applying this analysis, we conclude that substantial evidence supports the race-neutral reasons given by the prosecutor for his excusal of prospective jurors M.H., P.F., and L.P. We consider each challenged excusal in turn.

*a. Prospective Juror M.H.*

M.H. indicated that she was 40 years old, was single, and had no children. On her juror questionnaire, M.H. stated she was for the death penalty, and she confirmed that view on voir dire. When defense counsel asked whether her feelings stemmed from any personal experience, she replied, "Oh, no, no, not personally. But I figure if someone came to my house and blew my family away, I would flip the switch. But that's personal, that's why I believe in it. But I don't — I wouldn't sit here and tell this young man, okay, you need it because you killed somebody, I think there [are] also circumstances. But I know if it was my family, I couldn't honestly say that I wouldn't be emotional about it."

When defense counsel said that families are not the executioners, M.H. responded that she agreed, and confirmed she had no personal experiences relevant to the death penalty, but repeated that "if it was me personally and my family, that's totally different for me." When counsel asked if M.H. agreed we cannot have a system that allows a victim's family to take revenge, M.H. said, "Oh, definitely. I am not saying that. I think maybe you are misunderstanding what I am saying to you; are you misunderstanding me?"

M.H.'s remarks about the death penalty might be taken more than one way, but they could give rise to a reasonable concern that her willingness to impose this punishment might be influenced by her degree of direct interest in the case. The prosecutor expressed this concern by suggesting M.H.'s approval of the death penalty appeared to be "personal" and "emotional" — as in "if it was my family, I could understand it" — rather than "philosophical," such that she could apply

83

that penalty in any appropriate case. Moreover, as the Attorney General observes, M.H.'s somewhat testy exchange with defense counsel ("are you misunderstanding me?") could also, in combination with the prosecutor's personal observation of this prospective juror, persuade him her relative youth was a sign of immaturity.

Defendant points out that M.H. was 40 years old, not "in her 30's" as recalled by the prosecutor. Moreover, defendant asserts, the prosecutor's claim that M.H.'s combination of age, unmarried status, and childlessness had not previously been encountered in the jury pool was untrue. As defendant notes, Juror No. 12 had already disclosed on voir dire that he was 43 years old, unmarried, and childless. Finally, defendant urges that the prosecutor's characterization of M.H.'s death penalty views was unfair; M.H. simply meant, defendant asserts, that she might be emotional in her desire for the death penalty if her own family was involved, but could and would be fair in any case where her interest was not personal.

As noted, however, the prosecutor was not obliged to accept this precise interpretation of M.H.'s ambiguous remarks, and he could reasonably be concerned about her ability to give the death penalty fair consideration when a family member was not a victim. Moreover, even if Juror No. 12 shared some characteristics with M.H. that the prosecutor indicated were influential in excusing the latter, there was one substantial difference between the two panelists — Juror No. 12 expressed much stronger views in favor of the death penalty. Nothing indicates the prosecutor was wrong in suggesting that when M.H.'s age, familial status, *and death penalty views* were considered *together*, she was unique among the jurors who had been evaluated at the time the prosecutor excused her. Under these circumstances, the record adequately supports the prosecutor's statement of race-neutral reasons for exercising a peremptory challenge against M.H.

84

### b. Prospective Juror P.F.

P.F. declared in her questionnaire that "[t]he death penalty is a very serious consequence for committing a serious offense (murder). In order for someone to receive this punishment, I believe the person must have maliciously set out to destroy the life of someone else (and their loved ones), and have a history of such violent behavior w/o remorse." She stated her opinion that "the death penalty is not used often enough in cases where convicted felons have a repeated [behavior] pattern for committing violent crimes against others, such as murder."

On voir dire, defense counsel indicated to P.F. his impression that she was "kind of a strong proponent of the death penalty but not rabid about it, you just think it is appropriate sometimes?" P.F. answered, "Yeah, I mean if, how to answer it, if like I knew all the facts, you know, see everything, I would want to say for a judgment in my mind, but based upon the facts I wouldn't just arbitrarily say because of a particular crime, without knowing everything, what the punishment should be."

Later, the prosecutor asked P.F. what she meant on her questionnaire by stating she "felt the death penalty would be appropriate when there was a pattern of violent conduct. Did you mean by that anything in particular, as far as there would [have to be] a series of events, or more than one . . .?" P.F. answered, "What I had in mind wasn't a particular case, but like some cases, certain ones, the person just had a pattern of no regard for life." P.F. agreed when the prosecutor suggested "it wasn't something exclusive, just something you were thinking of that would be a strong consideration for you?" She agreed again when the prosecutor said, "It wasn't just like one system you would consider to look at; is that correct?"

Under these circumstances, the prosecutor's recall that P.F. had indicated the death penalty was appropriate for a "pattern of violent conduct" was not unfair.

85

Though certain of P.F.'s voir dire responses suggested she might consider the death penalty in other cases, it was reasonable for the prosecutor to be concerned that she might be reluctant to do so except in cases of the most calculated and malicious murder by someone who had committed similar violent acts in the past. The record thus supports the sincerity of the prosecutor's claim that P.F.'s expressed views on the death penalty were a race-neutral reason why he used a peremptory challenge to excuse her.

Defendant insists the record does not support the prosecutor's assertions about P.F.'s casual dress, and her "bored" and disinterested manner. As defendant observes, the record indicates that P.F. was a 911 operator for the police department. On the record, he suggests, her answers to all questions seem appropriate, and she appears facially to have been an ideal juror.

But the prosecutor's demeanor observations, even if not explicitly confirmed by the record, are a permissible race-neutral ground for peremptory excusal, especially when they were not disputed in the trial court. (*People v. Clark* (2011) 52 Cal.4th 856, 1012; see *People v. Fuentes* (1991) 54 Cal.3d 707, 715.)[28] We cannot say the record contradicts the race-neutral reasons stated by the prosecutor for his peremptory excusal of prospective juror P.F.

### c. Prospective Juror L.P.

On her questionnaire, L.P. listed her occupation as "Senior Social Worker." Asked her general feelings about the death penalty, L.P. responded, "My general

---

[28] Defendant asserts that the trial court cut off defense counsel's attempt to rebut the prosecutor's reasons. But counsel simply protested that Juror No. 12, like prospective juror M.H., was unmarried. There is no indication counsel sought to dispute the prosecutor's description of P.F.'s demeanor. Indeed, when the court thereafter asked if the *Wheeler/Batson* motion was submitted, defense counsel replied, "Yes."

feelings are that it is important when inflicting it to make sure that the person is guilty beyond a shadow of a doubt before imposing it."

On voir dire, the prosecutor told L.P. that her "shadow of a doubt" comment on her questionnaire had "just sort of stood out," and he asked her to explain what she meant. L.P. replied, "I think I said the major problem with it, because I wanted to make sure that the people were convicted beyond a shadow of a doubt." "In other words," the prosecutor suggested, "before we consider a penalty as serious as this, we want to make sure we know what the facts are; is that what you are saying . . .?" L.P. answered, "Yes."

Defendant insists that, in stating his reasons for excusing L.P., the prosecutor mischaracterized her "shadow of a doubt" comment. Defendant notes that L.P. made clear on voir dire she was willing to consider the death penalty so long as the person was *convicted* beyond a shadow of a doubt. Because the penalty jury would be told it must accept his conviction of Officer Burt's murder, defendant asserts, the prosecutor had no legitimate basis for concern that L.P. would refuse to entertain the possibility of a death sentence in this case.

However, in light of L.P.'s responses, it was reasonable for the prosecutor to be concerned that, for the proof of any facts pertinent to a possible death sentence, L.P. would insist not only on the elimination of *reasonable* doubt, but on the removal of *all* doubt. Moreover, the record confirms the prosecutor's recollection that L.P. was a social worker. The prosecutor's expressed reservation about having social workers on the jury was race-neutral. It also had "some basis in accepted trial strategy" (e.g., *Taylor*, *supra*, 47 Cal.4th 850, 886) insofar as it stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor. Hence, the record affords no basis to conclude that the prosecutor's reasons for excusing L.P. were insincere or pretextual.

87

Defendant urges that the trial court's terse ruling on the *Wheeler/Batson* motion does not represent a "sincere and reasoned effort" to assess whether the prosecutor's proffered race-neutral reasons for excusing M.H., P.F., and L.P. were his true reasons. Defendant asserts that the words used by the court — i.e., that "no discriminatory intent is *inherent* in the explanations, and the reasons appear to be race neutral" (italics added) — indicate the court addressed only the facial plausibility of the reasons claimed by the prosecutor, and failed to properly assess, under all the relevant circumstances, whether the prosecutor's explanations were credible.

However, we have made clear that "the trial court is not required to explain on the record its ruling on a *Batson/Wheeler* motion. (*People v. Reynoso*, *supra*, 31 Cal.4th [903,] 919.) 'When the prosecutor's stated reasons . . . are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.' (*People v. Silva* (2001) 25 Cal.4th 345, 386.)" (*Vines*, *supra*, 51 Cal.4th 830, 849.) Here, as noted, the prosecutor's reasons were plausible and, in all essential respects, supported.

Moreover, in arguing that the language of the trial court's ruling shows the court made no bona fide attempt to assess the prosecutor's credibility, defendant parses the court's words too closely. The court's assertion that no discriminatory intent was "inherent" in the prosecutor's explanations is reasonably read as a determination that the court believed them to be true.

We further note that, while considering the *Wheeler/Batson* motion, the court asked for the relevant juror questionnaires, and it presumably reviewed them. No reason appears to conclude the court failed to consider all the factors bearing on the prosecutor's credibility, including his demeanor, the inherent reasonableness or improbability of his proffered explanations, their plausible basis in accepted trial strategy, the court's own observation of the relevant jurors' voir

88

dire, its experience as a trial lawyer and judge in the community, and the common practices of the prosecutor's office and the individual prosecutor himself. (E.g., *People v. Jones* (2011) 51 Cal.4th 346, 360.) Defendant's *Wheeler/Batson* claim must be rejected.

### E. Claim of unreliable special circumstance and penalty verdicts.

Defendant urges that the trial procedures in this case denied him reliable determinations of death eligibility, and of the appropriate penalty, in violation of his state and federal constitutional rights to a reliable death judgment. (U.S. Const., 5th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 15, 17.) He suggests in general that the trial was an "empty charade" due to his counsel's deficiencies, and his own asserted incompetence to waive his rights and stand trial — claims we have already considered at length and rejected on this record.

In particular, however, he focuses anew on two aspects of the proceedings — his "slow plea" to the special circumstance allegation, and the penalty trial, at which he was permitted to present no mitigating evidence or argument and to give testimony inviting the jury to sentence him to death. He claims that regardless of his wishes, the state was authorized, indeed required, to override these decisions in order to protect the paramount public interest in reasoned, fair, and just death judgments, and to avoid being implicated in his desire to commit state-assisted suicide. We are not persuaded.

As defendant observes, California has recognized limited circumstances in which, as a matter of fundamental public policy, rights and decisions that are normally personal to a criminal defendant may be limited or overruled in the service of death penalty reliability. Thus, a capital defendant is not permitted to waive his or her automatic appeal of a death judgment. (Cal. Const., art. VI, § 11, subd. (a); Pen. Code, § 1239, subd. (b); *People v. Stanworth* (1969) 71 Cal.2d 820,

89

834.) Moreover, a plea of guilty to a capital felony may not be taken except in the presence of counsel, and with counsel's consent. (§ 1018.) Even if otherwise competent to exercise the constitutional right to self-representation (*Faretta v. California* (1975) 422 U.S. 806), a defendant may not discharge his lawyer in order to enter such a plea over counsel's objection. (E.g., *People v. Chadd* (1981) 28 Cal.3d 739, 747-757; see *People v. Alfaro* (2007) 41 Cal.4th 1277, 1299-1302.)

But here, defendant's counsel *did* consent to a "slow plea" on the issues of guilt and special circumstances. Nor did counsel agree simply to allow defendant to waive his trial rights for purposes of inviting a death judgment. On the contrary, their consent stemmed from their express decision — one we have deemed competent and reasonable under the circumstances — to preserve credibility with a penalty jury in the face of overwhelming evidence that defendant had gunned down a police officer during a routine traffic stop in order to eliminate the victim as a witness to serious felony evidence discovered during the encounter.

As we have also noted, competent counsel could conclude this "slow plea" strategy had the additional advantage of limiting the special circumstance evidence of the officer's "lawful" performance of duty to the showing made at the preliminary hearing. Defendant thereby avoided the risk that additional evidence on the "lawful duty" issue would be presented in a trial, while preserving the right to urge on appeal, if necessary, that the preliminary hearing evidence was legally insufficient. In turn, we have concluded that the evidence of Officer Burt's "lawful" performance *was* legally sufficient, in that a rational trier of fact, reviewing the evidence adduced at the preliminary hearing, could find beyond reasonable doubt — as the instant trial court necessarily did — that the victim was lawfully engaged in duty at the time he was killed. Under these circumstances, the fact that *defendant* may have had personal reasons, different from those of his

counsel, for agreeing to a "slow plea" does not undermine the fundamental reliability of the death judgment.

Nor are constitutional reliability concerns raised by the fact that defendant, at his own insistence, presented no mitigating evidence or argument at the penalty trial. "We have stated that 'a verdict is constitutionally reliable "when the prosecution has discharged its burden of proof at the guilt and penalty phases pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present." ' [Citation.] Under those conditions, despite a defendant's avowed intent not to present available evidence in mitigation, the state's interest in ensuring a reliable and fair penalty determination has been met. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1372.)

Finally, we have repeatedly rejected the contention that the constitutional reliability of a death judgment is undermined by recognizing the defendant's personal right to testify in favor of the death penalty. (*Nakahara*, *supra*, 30 Cal.4th 705, 719; *Webb*, *supra*, 6 Cal.4th 494, 534-535.) Though the instant jury received no specific instruction that " 'despite the defendant's testimony,' " it must decided the appropriate penalty based upon the factors in aggravation and mitigation (see *Webb*, *supra*, at p. 535, fn. 29, quoting *Guzman*, *supra*, 45 Cal.3d 915, 962), the jury was generally instructed that it must weigh the aggravating and mitigating evidence to determine the appropriate penalty, and should return a death verdict only if persuaded the aggravating circumstances were "so substantial" in comparison to mitigation that death was warranted. Jurors were

also told not to be swayed by bias against the defendant, that the listed aggravating factors were exclusive,[29] and that defendant's "behavior" in the courtroom could be considered only to rebut mitigating evidence of remorse if any such evidence was offered. No basis for reversal appears.

### F. Challenges to California death penalty statute and instructions.

Defendant raises numerous challenges to California's death penalty statute, and to the standard instructions given at his penalty trial. We have rejected the identical claims on many occasions, and defendant fails to persuade us that these decisions should be reconsidered.

Thus, we reaffirm that "the death penalty statute is not unconstitutional because it does not require 'unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' [Citation.] Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, affects our conclusions in this regard. [Citations.] No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof. [Citations.] That certain noncapital sentencing proceedings may assign a burden of proof to the prosecutor does not mean the death penalty statute violates a [capital] defendant's rights to equal protection or due process. [Citations.] . . . .

---

[29] The jury was also expressly advised that the only section 190.3 factors the jury could consider in aggravation were factors (a) (circumstances of the capital crime), (b) (other violent criminal conduct), and (c) (prior felony convictions).

The trial court need not instruct that there is a presumption of life. [Citation.]" (*People v. Dement* (2011) 53 Cal.4th 1, 55-56.)

Moreover, the statute is not unconstitutional because the special circumstances it specifies are so numerous or broad that it fails to genuinely narrow the class of persons eligible for the death penalty, or because it fails to require written findings. (E.g., *Vines*, *supra*, 51 Cal.4th 830, 891; *People v. Abilez* (2007) 41 Cal.4th 472, 533.) Section 190.3, factor (a), which allows the jury to consider the circumstances of the capital crime in aggravation, is not impermissibly overbroad and does not lead to arbitrary or capricious imposition of the death penalty. (E.g., *Vines*, *supra*, at p. 891; *Abilez*, *supra*, at p. 533; *People v. Robinson* (2005) 37 Cal.4th 592, 655; *People v. Kennedy* (2005) 36 Cal.4th 595, 641.) The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment (U.S. Const., 6th, 8th, and 14th Amends.), do not require intercase proportionality review on appeal. (E.g., *People v. Whalen* (2013) 56 Cal.4th 1, 91.)

CALJIC No. 8.88 is not impermissibly overbroad, vague, or misleading insofar as it specifies that the jury may impose death if persuaded the aggravating circumstances are "so substantial" in comparison to the mitigating circumstances that death is "warrant[ed]," and fails to advise that the central determination is whether death is the "appropriate" penalty. (E.g., *People v. Watkins* (2012) 55 Cal.4th 999, 1036; *People v. Gonzalez* (2012) 54 Cal.4th 1234, 1299.) Nor was the trial court required to delete inapplicable sentencing factors from the penalty instructions. (E.g., *People v. Valdez* (2012) 55 Cal.4th 82, 180; *People v. McDowell* (2012) 54 Cal.4th 395, 444.)[30]

---

[30] Though, as noted above (fn. 29, *ante*), the jury was told that the only applicable section 190.3 factors in aggravation were factors (a), (b), and (c).

Finally, California's death penalty scheme does not violate international law and norms. (E.g., *People v. Houston* (2012) 54 Cal.4th 1186, 1232.) We are not persuaded otherwise by *Roper v. Simmons* (2005) 543 U.S. 551, in which the high court cited evolving international standards as "respected and significant" support for its holding that the Eighth Amendment prohibits imposition of the death penalty against persons who committed their crimes *as juveniles*. (*Roper*, at p. 578.)

## DISPOSITION

The judgment is affirmed.


BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

**CONCURRING OPINION BY LIU, J.**


The trial court in this case denied defendant's objection to the prosecutor's peremptory strikes of all three black prospective jurors with the following statement: "Well, the court finds that no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral, and on those grounds the court will deny the *Wheeler* motion." Because defendant has not shown that it was more likely than not that the strikes were racially motivated, I agree that his claim must be denied. I cannot agree, however, with aspects of today's opinion that improperly defer to the trial court's ruling and, in so doing, fail to evaluate defendant's claim in the manner that high court precedent requires.

*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) set forth a three-step framework for evaluating a claim that a peremptory strike was based on race. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*).) In order to prevail,

1

the defendant must show that "it was more likely than not that the challenge was improperly motivated." (*Id.* at p. 170.)

The present case involves *Batson*'s third step. Ordinarily, an appellate court must review the denial of a *Batson* motion at the third step with deference to the trial court. (See *Snyder v. Louisiana* (2008) 552 U.S. 472, 477 (*Snyder*); *Batson*, *supra*, 476 U.S. at p. 98, fn. 21.) This rule of deference is warranted because *Batson*'s third-step inquiry often involves evaluation of "whether the prosecutor's demeanor belies a discriminatory intent." (*Snyder*, at p. 477.) In addition, if the prosecutor has invoked a juror's demeanor as the reason for a strike, the *Batson* inquiry requires evaluation of "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." (*Ibid.*) "[T]hese determinations of credibility and demeanor lie ' "peculiarly within a trial judge's province" ' [citation] . . . ." (*Ibid.*)

However, deference is unwarranted "when a trial court fails to make explicit findings or to provide any on-the-record analysis of the prosecution's stated reasons for a strike." (*People v. Williams* (2013) 56 Cal.4th 630, 717 (*Williams*) (dis. opn. of Liu, J.).) In such circumstances, "a reviewing court has no assurance that the trial court has properly examined 'all of the circumstances that bear upon the issue' of purposeful discrimination." (*Ibid.*, quoting *Snyder*, *supra*, 552 U.S. at p. 478; see *United States v. Rutledge* (7th Cir. 2011) 648 F.3d 555, 559 ["if there is nothing in the record reflecting the trial court's decision, then there is nothing to which we can defer"].) In this case, the trial court's statement that "no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral" does not indicate that it conducted the thorough and careful inquiry at *Batson*'s third step exemplified by the high court's decisions in *Snyder* and *Miller-El v. Dretke* (2005) 545 U.S. 231 (*Miller-El*). By erroneously deferring to the trial court's ruling, this court has once again effectuated "the denial of [a]

2

defendant's *Batson* claim despite the fact that *no court*, trial or appellate, has ever conducted a proper *Batson* analysis."  (*Williams*, at p. 700 (dis. opn. of Liu, J.).)

I recently explained in *Williams* that our deference to *Batson* rulings unaccompanied by explicit findings or analysis falls on the wrong side of a split of authority on the correct approach to appellate review at *Batson*'s third step.  (See *Williams*, *supra*, 56 Cal.4th at pp. 709–715 (dis. opn. of Liu, J.) [reviewing state and federal case law refusing to accord deference to unexplained *Batson* rulings, including *United States v. McAllister* (6th Cir. 2012) 693 F.3d 572, 581–582, *Rutledge*, *supra*, 648 F.3d at page 559, *Coombs v. Diguglielmo* (3d Cir. 2010) 616 F.3d 255, 261–265, and *Green v. LaMarque* (9th Cir. 2008) 532 F.3d 1028, 1031].)  In this opinion, I show how this unwarranted deference results in judicial inquiry that falls short of what is required in a proper *Batson* analysis.  I also trace the origins of our erroneous doctrine and discuss the unfair and counterproductive consequences of our approach.  For some time now, our jurisprudence has not demanded that trial courts or reviewing courts demonstrate a truly reasoned effort to evaluate *Batson* claims in light of all relevant circumstances bearing on the issue of purposeful discrimination.  And the results, which I document in another opinion filed today, are quite remarkable:  In the 102 cases where this court has addressed a *Batson* claim over the past 20 years, we have found *Batson* error only once — and that was 12 years ago.  (See *People v. Harris* (Aug. 26, 2013, S081700) __ Cal.4th __, __ [at pp. 33–34, 42–44] (conc. opn. of Liu, J.).)

Because high court precedent has consistently recognized the manifold harms of racial discrimination in jury selection and has accordingly required more careful and thorough inquiry than our case law provides, I respectfully disagree with the deferential framework that this court continues to apply in reviewing unexplained *Batson* rulings on appeal.

3

# I.

Reciting our precedent, today's opinion says: " ' "Review of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*People v. Lenix* (2008) 44 Cal.4th 602, 613–614.)' ([*People v. Vines* (2011)] 51 Cal.4th 830, 848.)" (Maj. opn., *ante*, at p. 80.) So far so good: Deference is appropriate where the trial court makes "a sincere and reasoned effort" to evaluate the prosecutor's stated reasons for striking a minority juror.

I have no doubt the trial court in this case was sincere. But the record provides no basis for us to conclude that the trial court made a *reasoned* effort to analyze the prosecutor's explanations for the strikes. There is no *reasoning* in the trial court's statement that "no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral." Moreover, when defense counsel noted that "[Juror No. 12] is also unmarried" in response to the prosecutor's assertion that he struck prospective juror M.H. in part because "[M.H.] is single," the trial court was "[a]pparently confused by counsel's remark" and did not probe the comparison. (Maj. opn., *ante*, at p. 79; see *People v. Lenix* (2008) 44 Cal.4th 602, 624 (*Lenix*) [trial courts are best positioned to consider comparative juror analysis].) Taken at face value, the trial court's mere observation that "no discriminatory intent is *inherent* in the explanations, and the

4

reasons *appear* to be race neutral" (italics added) does not address whether the race-neutral reasons given by the prosecutor were the *actual* reasons motivating the strikes. The inquiry at *Batson*'s third stage requires more than a determination of inherent or apparent plausibility; it "requires the judge to assess the plausibility of [the prosecutor's stated] reason in light of all evidence with a bearing on it." (*Miller-El*, *supra*, 545 U.S. at p. 252.) Nothing in the record shows that the trial court conducted the requisite inquiry.

Today's opinion attempts to fill the gap in two ways. First, it says the trial court's "assertion that no discriminatory intent was 'inherent' in the prosecutor's explanations is reasonably read as a determination that the court believed them to be true." (Maj. opn., *ante*, at p. 87.) But that reading of the word "inherent" is as strained as it is ironic in light of this court's own usage of the word in this context. (See *Williams*, *supra*, 56 Cal.4th at p. 653 [a prosecutor's explanation is "inherently plausible" if it is " 'not inherently implausible' "].) Further, right after the trial court used the word "inherent," it said "the reasons *appear* to be race neutral" (italics added). If the trial court had made a determination that the prosecutor's reasons were in fact true, why didn't it just say so and provide its analysis instead of using doubly qualified, conclusory language? It is this court that "parses the [trial] court's words too closely" (maj. opn., *ante*, at p. 87) instead of giving them their plain meaning.

Second, today's opinion says the trial "court asked for the relevant juror questionnaires, and it presumably reviewed them. No reason appears to conclude the court failed to consider all the factors bearing on the prosecutor's credibility, including his demeanor, the inherent reasonableness or improbability of his proffered explanations, their plausible basis in accepted trial strategy, the court's own observation of the relevant jurors' voir dire, its experience as a trial lawyer and judge in the community, and the common practices of the prosecutor's office

5

and the individual prosecutor himself." (Maj. opn., *ante*, at pp. 87–88. But cf. *Adkins v. Warden* (11th Cir. 2013) 710 F.3d 1241, 1254 ["trial court's personal experience with and opinion about the reputation of the prosecutor" was not a proper consideration at *Batson*'s third stage because it was "non-record evidence which [the defendant] did not have an opportunity to rebut"].) There is a wide chasm, however, between the absence of reasons to conclude that the trial court did not conduct a proper *Batson* analysis and the presence of reasons to conclude that it did. (See *Snyder*, *supra*, 552 U.S. at p. 479 [reviewing court may not credit juror demeanor as the reason for a strike where the trial court made no "specific finding on the record concerning [the juror's] demeanor" and "simply allowed the challenge without explanation"].) If a reviewing court can simply fill the void with a massive pile of presumptions, then we can be assured that many trial courts will continue to deny *Batson* claims without reasoned explanation. Indeed, we might as well dispense with appellate review in such cases since it is so easy to rationalize a silent record with a cacophony of presumptions.

The court knows we cannot actually do this under *Miller-El* and *Snyder*, so its real answer to the problem of unexplained *Batson* rulings is the following: "we have made clear that 'the trial court is not required to explain on the record its ruling on a *Batson*/*Wheeler* motion. (*People v. Reynoso* [(2003)] 31 Cal.4th [903,] 919.) "When the prosecutor's stated reasons . . . are both *inherently plausible* and *supported by the record*, the trial court need not question the prosecutor or make detailed findings." (*People v. Silva* (2001) 25 Cal.4th 345, 386.)' ([*People v. Vines* (2011)] 51 Cal.4th 830, 849.)" (Maj. opn., *ante*, at p. 87, italics added.) " ' " ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " (*People v. Stanley* [(2006)] 39 Cal.4th [913,] 936.)' " (*Id.* at p. 80.)

6

The swarm of internal quotation marks around the rule stated above indicates that this court has often found it to be a handy tool in rejecting *Batson* claims. The discussion in part II below excavates the tenuous origins of this rule in our *Batson* jurisprudence. Here I focus on how our application of the rule dilutes the proper inquiry at *Batson*'s third step.

The problem, in a nutshell, is this: Our court routinely holds that so long as the prosecutor's stated reason for striking a minority juror is (1) inherently plausible and (2) supported by the record, we must presume that the trial court's denial of a *Batson* motion, even if rendered without any explicit findings or analysis, was premised on a full inquiry into all the relevant circumstances bearing on the credibility of the prosecutor's explanation. That presumption, in turn, entitles the trial court's ruling to deference on appeal. But to say that a prosecutor's stated reason is inherently plausible is only to say that it is "not 'inherently implausible.' " (*Williams*, *supra*, 56 Cal.4th at p. 653.) That is a far cry from evaluating whether the stated reason was likely the actual reason for a particular strike given the totality of relevant circumstances. And to say that a prosecutor's stated reason is "supported by the record" is only to say that there is some evidence to support the reason or (in an even weaker formulation) that the stated reason is not contradicted by the record. (*People v. Reynoso* (2003) 31 Cal.4th 903, 929 (*Reynoso*).) Again, that is a far cry from inquiring, based on all relevant circumstances, how likely it is that the stated reason was the actual reason for the strike. The *Batson* inquiry ultimately requires an assessment of likelihoods; it is the defendant's burden to prove that "it was more likely than not that the challenge was improperly motivated." (*Johnson*, *supra*, 545 U.S. at p. 170.) An explanation can be plausible without being likely, and an explanation can be supported by some evidence or uncontradicted by the record without being likely based on the totality of relevant circumstances. I do not see how the fact

7

that a proffered reason is inherently plausible and supported by the record enables us to presume that the trial court actually reached a decision as to whether it was *more likely than not* that the proffered reason was pretextual in light of all relevant circumstances.

This analytical gap and related errors are apparent in several aspects of today's opinion. Consider the court's discussion of the strike against prospective juror M.H. On her juror questionnaire, M.H. indicated that she was a 40-year-old computer consultant with a bachelor's degree in math and computer science. She was single and had no children. She had formed no opinions about the present case and expressed no hesitations about her ability to follow the court's instructions and serve as an impartial juror. When asked for her general feelings about the death penalty, M.H. wrote "I am for the death penalty." When asked whether the death penalty has been given too often, too seldom, or randomly, M.H. wrote "I feel the death penalty has been used appropriately. Especially given that some of the defendants have spent years on death row." M.H. further indicated that her views on the death penalty had not changed in the last few years. M.H. did not support or belong to any victim rights groups; she did not belong to any group advocating either abolition or increased use of the death penalty; she did not have any close friends or relatives who had been arrested or convicted of a crime. M.H. said her views on capital punishment would not cause her to automatically vote for or against the death penalty without considering the aggravating and mitigating evidence presented.

At voir dire, when defense counsel asked whether her support for the death penalty stemmed from "some experience of your own," M.H. said: "Oh, no, no, not personally. But I figure if someone came to my house and blew my family away, I would flip the switch. But that's personal, that's why I believe in it. But I don't — I wouldn't sit here and tell this young man, okay, you need it because you

killed somebody, I think there [are] also circumstances. But I know if it was my family, I couldn't honestly say that I wouldn't be emotional about it." On further questioning, M.H. confirmed she had no personal experiences related to the death penalty but again said "if it was me personally and my family, that's totally different for me."

The prosecutor gave the following explanation for striking M.H.: "[M.H.] is single. She has no children. She is younger than the juror I prefer. She is in her 30's. She is also, her attitude regarding the death penalty was personal and emotional, not philosophical. She was the one who talked about, if it was my family I could understand it. But primarily the reason [is] she is young, single and no children. There [are] no other jurors on the jury presently who fit that pattern."

In assessing the prosecutor's explanation, today's opinion says that M.H.'s statements at voir dire "could give rise to a reasonable concern that her willingness to impose this punishment might be influenced by her degree of direct interest in the case" (maj. opn., *ante*, at p. 82) and that the prosecutor "could reasonably be concerned about her ability to give the death penalty fair consideration when a family member was not a victim" (*id.* at p. 83). The word "could" makes it hard to disagree insofar as one cannot say that the court's posited reading of M.H.'s remarks is entirely implausible. But even if plausible, is it *likely* that a reasonable person would have understood M.H.'s statements that way? M.H. clearly stated that her support for the death penalty was unrelated to any personal experience ("Oh, no, no, not personally"). She wrote on her questionnaire that "I am for the death penalty" and that her view had not changed in the last few years. She further indicated that "I feel the death penalty has been used appropriately. Especially given that some of the defendants have spent years on death row." It does not seem likely that a person familiar with M.H.'s questionnaire and her full answers at voir dire would have understood her support for the death penalty to be,

9

as the prosecutor put it, "personal and emotional, not philosophical." M.H.'s remarks simply conveyed that she would have an emotional reaction if her family were murdered ("I would flip the switch"), not that she did not support or could not apply the death penalty in other circumstances.

The court attempts to buttress the prosecutor's explanation with the following statement: "Moreover, as the Attorney General observes, M.H.'s somewhat testy exchange with defense counsel ('are you misunderstanding me?') could also, in combination with the prosecutor's personal observation of this prospective juror, persuade him her relative youth was a sign of immaturity." (Maj. opn., *ante*, at p. 83.) But the inclusion of this sentence in the court's *Batson* analysis is wrong on two counts. First, the prosecutor said one reason he struck M.H. was that "she is young" and "younger than the juror I prefer." The prosecutor said nothing about "immaturity." The prosecutor might have treated youth as a proxy for liberal views, compassion for criminal defendants, or something else. We do not know what underlies the prosecutor's preference, and neither the Attorney General nor this court may shore up a reason that the prosecutor actually gave with a reason he did not give. (See *Miller-El*, *supra*, 545 U.S. at p. 252 ["[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. . . . If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."].) Second, under *Snyder*, we have no basis to credit "the prosecutor's personal observation of this prospective juror" (maj. opn., *ante*, at p. 83) as part of the basis for the strike because "the record does not show that the trial judge actually made a determination concerning [M.H.'s] demeanor." (*Snyder*, *supra*, 552 U.S. at p. 479.)

10

Moreover, the court dismisses the import of comparing M.H. to Juror No. 12 on the ground that "Juror No. 12 expressed much stronger views in favor of the death penalty. Nothing indicates the prosecutor was wrong in suggesting that when M.H.'s age, familial status, *and death penalty views* were considered *together*, she was unique among the jurors who had been evaluated at the time the prosecutor excused her." (Maj. opn., *ante*, at p. 83.) But recall what the prosecutor actually said in striking M.H.: "[M.H.] is single. She has no children. She is younger than the juror I prefer. She is in her 30's. She is also, her attitude regarding the death penalty was personal and emotional, not philosophical. She was the one who talked about, if it was my family I could understand it. But primarily the reason [is] she is young, single and no children. There [are] no other jurors on the jury presently who fit that pattern." The prosecutor begins with his concern that M.H. is young (she was actually 40, not "in her 30's"), single, and without children. He then discusses M.H.'s death penalty views. At the end, he pivots and prioritizes his opening concern: "*But primarily* the reason [is] she is young, single and no children. There [are] no other jurors on the jury presently who fit that pattern." (Italics added.) It may be possible to construe "that pattern" to encompass M.H.'s death penalty views in addition to her age and familial status. But again, even if such an interpretation is plausible, is it *likely* that that is what the prosecutor meant? When the prosecutor's last two sentences are read together, the most natural understanding of his assertion that "There [are] no other jurors on the jury presently who fit that pattern" is that he believed no other jurors were "young, single and no children." And on this point, the record shows that two seated jurors close in age to M.H. were single and without children: Juror No. 1 (age 45) and Juror No. 12 (age 43).

Even if we were to fold in the prosecutor's comments about M.H.'s death penalty views as part of "that pattern," we would have to acknowledge, as

11

discussed above, that those comments offer an unlikely (even if plausible) rendition of the views she expressed. And once that is acknowledged, it seems doubtful to say that "Juror No. 12 expressed much stronger views in favor of the death penalty" than M.H. did. (Maj. opn., *ante*, at p. 83.) As to his general feelings about the death penalty, Juror No. 12 wrote on his questionnaire "I'm for it," whereas M.H. wrote "I am for the death penalty." Juror No. 12 indicated he felt the death penalty is used "too seldom" and noted "too many appeals that take too long"; M.H. said "I feel the death penalty has been used appropriately. Especially given that some of the defendants have spent years on death row." Juror No. 12 qualified his views by indicating that "if court proved to me that defendant should be spared death – I might not vote death." Further, he noted that his ability to serve as an impartial juror might be affected if "defendant said he'd found God and should be spared for that reason." On her questionnaire, M.H. did not qualify her support for the death penalty in any way. The principal difference between Juror No. 12 and M.H. is that Juror No. 12 wrote on his questionnaire that his cousin-in-law was a fireman who had tried to save the murder victim and that he had already formed an opinion that defendant deserved the death penalty. But we can hardly cite Juror No. 12's preconception about this case (as distinct from his views about the death penalty in general) as a proper basis for differentiating him from M.H., since we have upheld the trial court's refusal to excuse Juror No. 12 for cause on the ground that during voir dire he "consistently indicated that he could and would subordinate his views, carefully weigh and consider the aggravating and mitigating evidence as instructed, vote for either death or life without parole as appropriate, and sit fairly in accordance with the juror's oath." (Maj. opn., *ante*, at p. 76.) Whether there were other differences between Juror No. 12 and M.H. is something we do not know because the trial court, despite defense counsel's prompting, did not conduct a comparative juror analysis.

12

In the end, the court finds only that "the prosecutor's reasons were plausible and, in all essential respects, supported" (maj. opn., *ante*, at p. 87) because that is enough under our precedent to entitle the trial court's unexplained *Batson* ruling to deference on appeal. As shown above, this approach cannot be reconciled with the high court's mandate that "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." (*Snyder*, *supra*, 552 U.S. at p. 478, citing *Miller-El*, *supra*, 545 U.S. at p. 239; see *Batson*, *supra*, 476 U.S. at p. 94.) Tellingly, today's opinion nowhere actually says that the trial court or this court has independently determined, based on all relevant circumstances, that it was not more likely than not that the prosecutor's strikes of the three black prospective jurors were motivated by race. As in *Williams*, our decision today results in "the denial of defendant's *Batson* claim despite the fact that *no court*, trial or appellate, has ever conducted a proper *Batson* analysis." (*Williams*, *supra*, 56 Cal.4th at p. 700 (dis. opn. of Liu, J.).)

## II.

Although the legal shortcuts that pervade the *Batson* analysis in today's opinion are troubling, the reality is that habits of unwarranted deference, speculative inference, and overreliance on gap-filling presumptions have been entrenched in our *Batson* jurisprudence for some time now. As I discuss in *People v. Harris* (Aug. 26, 2013, S081700) __ Cal.4th __, __ [at pp. 33–34] (*Harris*) (conc. opn. of Liu, J.), also filed today, this court has found only one instance of unlawful discrimination in jury selection among the 102 cases that have raised *Batson* claims over the past 20 years, and none among the 59 cases that postdate *Miller-El*. This improbable record is attributable, at least in part, to the erroneous legal framework that we continue to apply in evaluating *Batson* claims. In *Harris*, I discuss the problematic development of our case law on what is required to

13

establish an inference of discrimination at *Batson*'s first step. (*Harris*, at pp. __–__ [at pp. 24–28] (conc. opn. of Liu, J.).) Here I trace the development of our erroneous rule of deference at *Batson*'s third step.

**A.**

The deferential approach we apply to unexplained *Batson* rulings was not always a part of our law. In the wake of *People v. Wheeler* (1978) 22 Cal.3d 258, our state-law forerunner of *Batson*, this court in *People v. Hall* (1983) 35 Cal.3d 161 (*Hall*) emphasized that a trial court, in considering a *Wheeler* motion, must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges." (*Id.* at pp. 167–168.) We did not clearly define what a trial court must do in order to demonstrate that it had made this inquiry, nor did we connect a trial court's failure to conduct this inquiry with the level of deference owed on appeal. But we did suggest that a trial court must undertake more than a summary denial if there was some basis for questioning the prosecutor's reasons. In *Hall*, we evaluated the prosecutor's explanations and found that some were "suggestive of bias" and "demanded further inquiry on the part of the trial court." (*Id.* at pp. 168–169.) "Yet the trial court apparently considered itself bound to accept all of the prosecutor's explanations at face value, expressing the view that group bias is shown only when a prosecutor declares an intent to exclude all members of an ethnic group from the jury. Such abdication is inconsistent with the court's obligations under *Wheeler*, and on authority of that case must be held to constitute error requiring reversal." (*Id.* at p. 169, fn. omitted.)

In *People v. Turner* (1986) 42 Cal.3d 711 (*Turner*), we applied *Hall*'s requirement that trial courts make a "sincere and reasoned attempt to evaluate the

prosecutor's explanation" for striking a minority juror (*Hall*, *supra*, 35 Cal.3d at p. 167). The trial court in *Turner* had denied defendant's *Batson* motion without comment. We observed that "the prosecutor's explanations were either implausible or suggestive of bias. They therefore 'demanded further inquiry on the part of the trial court' ([*Hall*] at p. 169), followed by a 'sincere and *reasoned*' effort by the court to evaluate their genuineness and sufficiency in light of all the circumstances of the trial (*id.*, at p. 167, italics added). Each step is 'imperative, if the constitutional guarantee is to have real meaning' (*ibid.*). [¶] We conclude that . . . the prosecution failed to sustain its burden of showing that the challenged prospective jurors were not excluded because of group bias [citation], and as in *Hall* the court failed to discharge its duty to inquire into and carefully evaluate the explanations offered by the prosecutor [citation]." (*Turner*, at p. 728.) On that basis, the court reversed the capital conviction. (*Ibid.*)

We found reversible error on similar grounds in three subsequent capital cases, all without dissent. In *People v. Snow* (1987) 44 Cal.3d 216, the court, in a unanimous opinion by Chief Justice Lucas, determined that "it strongly appears that the trial judge . . . simply accepted at face value the prosecutor's denials of group bias, without making any 'sincere and reasoned attempt' to evaluate the prosecutor's motives. Under *Hall*, '[s]uch abdication is inconsistent with the court's obligations under *Wheeler* . . . .' ([*Hall*, *supra*,] 35 Cal.3d at p. 169.)" (*Id.* at p. 226.) Similarly, *People v. Fuentes* (1991) 54 Cal.3d 707 (*Fuentes*) held that the trial court failed to conduct "a truly 'reasoned attempt' to evaluate the prosecutor's explanations" because it did not "address the challenged jurors individually to determine whether any one of them has been improperly excluded." (*Id.* at p. 720.) Notably, the court in *Fuentes* "reemphasize[d] the trial court's role in making an adequate record when dealing with a *Wheeler* motion. Notwithstanding the deference we give to a trial court's determinations of

15

credibility and sincerity, *we can only do so when the court has clearly expressed its findings and rulings and the bases therefor*." (*Id.* at p. 716, fn. 5, italics added.) A decade later, in *People v. Silva* (2001) 25 Cal.4th 345 (*Silva*), we observed that the trial court had failed to probe discrepancies between the prosecutor's stated reasons and the record of voir dire, and we held that "[o]n this record, we are unable to conclude that the trial court met its obligations to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' ([*Hall*, *supra*, 35 Cal.3d at pp. 167–168]) and to clearly express its findings ([*Fuentes*, at p. 716, fn. 5])." (*Silva*, at p. 385.)

## B.

As it turns out, *Silva* now stands as the sole instance during the past 20 years in which this court has found a *Batson* error. An early sign of erosion of *Hall*'s "sincere and reasoned" evaluation requirement appeared in *People v. Johnson* (1989) 47 Cal.3d 1194, where a divided court accorded deference to the trial court's summary and unexplained ruling even though there was some reason to question the prosecutor's reasons. Justice Mosk, joined by Justice Broussard, observed in dissent that the trial court, instead of actually inquiring into the prosecutor's explanations, simply said that the prosecutor had stated his reasons for striking eight minority jurors and then "continued its oral ruling with a rambling statement" at best implying that the stated reasons were facially neutral, not that they were "bona fide." (*Id.* at pp. 1289–1290 (dis. opn. of Mosk, J.).) But the court, after criticizing the dissent for engaging in comparative juror analysis and for questioning the plausibility of some of the prosecution's explanations, emphasized the deference owed to the trial court: "Here an experienced trial judge saw and heard the entire voir dire proceedings by which defendant's jury was selected. The record indicates he was aware of his duty under *Wheeler* to be sensitive to the manner in which peremptory challenges were used. He found no

16

improper use of the peremptory challenges by the prosecutor. Under these circumstances we see no good reason to second-guess his factual determination." (*Id.* at p. 1221.)

Thereafter, the court cited *People v. Johnson* in two cases upholding what were essentially summary denials of *Batson* claims. *People v. Cummings* (1993) 4 Cal.4th 1233 explained that "[t]he prosecutor offered adequate justification, unrelated to group bias, for the exercise of peremptory challenges. [Citations.] It was not necessary for the court to make additional inquiry. There is no basis in the record for the assertion that the court failed to scrutinize the prosecutor's reasons to determine if they were pretextual." (*Id.* at p. 1282.) And the court in *People v. Jackson* (1996) 13 Cal.4th 1164 said that "*Wheeler* does not require the trial court to conduct further inquiry into the prosecutor's race-neutral explanations if, as here, it is satisfied from its observations that any or all of them are proper." (*Id.* at p. 1198.)

The court in *Silva* attempted to reconcile cases like *Johnson*, *Cummings*, and *Jackson* with *Hall*'s "sincere and reasoned" evaluation requirement as well as the requirement that the trial court "clearly express[] its findings and rulings and the bases therefor" (*Fuentes*, *supra*, 54 Cal.3d at p. 716, fn. 5). On its facts, *Silva* was a straightforward case. The prosecutor all but announced at the outset of jury selection that he planned to discriminate on the basis of race because a previous hung jury in the penalty phase had divided on racial lines. (*Silva*, *supra*, 25 Cal.4th at pp. 375–376.) He struck five Hispanic jurors and, when asked to explain, gave reasons that were directly contradicted by the record. (*Id.* at pp. 379–381.) The trial court nevertheless denied the defendant's motion without probing "the obvious gap" between the prosecutor's reasons and the record. (*Id.* at p. 385.) This court reversed the death verdict. (*Id.* at p. 386.)

17

In a critical paragraph, the court in *Silva* said: "Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.]" (*Silva*, *supra*, 25 Cal.4th at pp. 385–386.) This principle, echoing *Fuentes* and *Hall*, was the ground on which *Silva* was decided. (See *Silva*, at pp. 385 ["On this record, we are unable to conclude that the trial court met its obligations to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' ([*Hall*, *supra*, 35 Cal.3d at pp. 167–168]) and to clearly express its findings ([*Fuentes*, *supra*, 54 Cal.3d at p. 716, fn. 5])."].) However, the court in *Silva* went on to add the following two sentences: "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Silva*, at p. 386.) The second of these two sentences addressed the circumstances in *Silva*. The first sentence, however, was dicta; the court had no occasion in *Silva* to decide what inquiry or findings a trial court must make when a prosecutor's stated reasons are inherently plausible and supported by the record. Nevertheless, these two sentences have come to comprise the rule that crucially qualifies the trial court's obligation to make a sincere and reasoned attempt to evaluate the prosecutor's explanations at *Batson*'s third stage.

Two years later, the court in *Reynoso* turned *Silva*'s dicta into doctrine. In that case involving two Hispanic defendants, the prosecutor exercised only four peremptory challenges, the last two of which were directed at the only two Hispanic prospective jurors then on the panel. (*Reynoso*, *supra*, 31 Cal.4th at

18

p. 909.) After the trial court found that the defense had established a prima facie case of discrimination, the prosecutor explained that he struck one of the two Hispanic panelists, Elizabeth G., because she was a " 'customer service representative' " and therefore " 'did not have enough educational experience,' " and because " '[i]t seemed like [Elizabeth G.] was not paying attention to the proceedings and . . . that she was not involved in the process.' " (*Id.* at p. 911.) The trial court immediately ruled as follows: " 'And I accept those reasons as being not based upon race or ethnicity. And I don't find that there has been a violation of *Wheeler* and that the — there was not a systematic exclusion of a recognized ethnic group, i.e., Hispanics in this case. So the motion is denied.' " (*Ibid.*) Defense counsel then argued that nothing in Elizabeth G.'s demeanor justified the strike. (*Id.* at pp. 911–912.) The trial court did not comment further except to note that the defense had also struck one Hispanic panelist. (*Id.* at pp. 912–913.)

This court, in a four-to-three decision, upheld the trial court's ruling. While acknowledging that a trial court " 'must "make a sincere and reasoned attempt to evaluate the prosecutor's explanation . . . ." (*People v. Hall* (1983) 35 Cal.3d 161, 167–168)' [Citation]," the court in *Reynoso* said that "in fulfilling that obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's race-neutral reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom." (*Reynoso*, *supra*, 31 Cal.4th at p. 919.) The court went on to highlight the dicta from *Silva* that " '[w]hen the *prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed*

19

*findings.'* " (*Reynoso*, at p. 923, quoting *Silva*, *supra*, 25 Cal.4th at p. 386, italics added by *Reynoso*.)

The court then determined that the trial court had satisfied its obligations and that its ruling was entitled to deference. The court acknowledged that the prosecutor's first reason for striking Elizabeth G. — her lack of " 'educational experience' " — was "of questionable persuasiveness," at least "when viewed objectively." (*Reynoso*, *supra*, 31 Cal.4th at p. 924.) But her "answers to the general questions" did confirm that she worked as customer service representative. (*Ibid.*) Noting that she also had "no prior jury experience and no past contact with the criminal justice system" — facts not mentioned by the prosecutor in explaining this strike — the court concluded that a prosecutor "arguably could conclude in sincerity" that a prospective juror like Elizabeth G. "would not be the best type of juror for the case." (*Id.* at pp. 924–925.) The court justified this conclusion with additional speculation: "Such a determination might be further supported by a myriad of factors readily observable by those present in the courtroom, but not by those who are reviewing the case from a cold transcribed record on appeal." (*Id.* at p. 925.)

As to the prosecutor's second reason for striking Elizabeth G. — that she appeared inattentive — the court acknowledged that "the trial court made no attempt to clarify or probe the prosecutor's reasons for finding Elizabeth G.'s demeanor while in the jury box unsuited to jury service." (*Reynoso*, *supra*, 31 Cal.4th at p. 926.) "But," the court said, "the trial court did expressly accept the prosecutor's race-neutral reasons for the peremptory challenge to Elizabeth G., finding them sincere and genuine. Since the trial court was in the best position to observe the prospective jurors' demeanor and the manner in which the prosecutor exercised his peremptory challenges, the *implied* finding, that the prosecutor's reasons for excusing Elizabeth G., including the demeanor-based reason, were

sincere and genuine, is entitled to 'great deference' on appeal. [Citations.]" (*Ibid.*, italics added.) The court added that it found nothing "in the record to directly contradict" the trial court's ruling and noted that the prosecutor accepted the jury "*14 times* with Elizabeth G. seated in the jury box." (*Ibid.*)

*Reynoso* went on to state the following rule, which is now boilerplate language in our case law: "Where . . . the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible (*Silva*, *supra*, 25 Cal.4th at p. 386), and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (*Reynoso*, *supra*, 31 Cal.4th at p. 929.)

Justice Kennard, joined by Justice Werdegar and Justice Moreno, dissented. Justice Kennard observed that in "[b]rushing . . . aside" the fact that the trial court had ruled on the *Batson* motion without questioning the prosecutor, making particularized findings, stating the proper legal standard, or addressing the factual disputes raised by the defense, the court had "indulge[d] a presumption that both the prosecutor and the trial court acted properly, thereby adopting a standard of appellate review that effectively insulates discriminatory strikes from meaningful scrutiny at both the trial and appellate stages." (*Reynoso*, *supra*, 31 Cal.4th p. 930 (dis. opn. of Kennard, J.).) According to Justice Kennard, the prosecutor's reliance on Elizabeth G.'s employment as a customer service representative was

21

the sort of implausible explanation that required further investigation and explicit findings, and the trial court made no effort to resolve the disputed claim that Elizabeth G. had not been paying attention. (*Id.* at pp. 931–932). "Appellate deference is unwarranted where, as here, the record supplies many reasons to doubt that the trial court even made a credibility determination, much less a determination resulting from a sincere and reasoned effort." (*Id.* at p. 935.)

Justice Moreno authored a separate dissent joined by Justice Kennard and Justice Werdegar. After observing that the record did not support either of the prosecutor's stated reasons for striking Elizabeth G. (*Reynoso*, *supra*, 31 Cal.4th at pp. 940–942 (dis. opn. of Moreno, J.)), Justice Moreno concluded: "Whereas *Silva* held that a trial court's obligation to inquire was triggered by a race-neutral excuse unsupported by the record, the majority today holds that such an obligation is triggered only where such an excuse is contradicted by the record. However, where the unexamined race-neutral excuse belies common sense or is contradicted by defense counsel, we cannot presume that the prosecutor has exercised the peremptory challenge in a constitutional manner." (*Id.* at p. 943; see *id.* at p. 940 ["today, without a sound basis in logic or law, a majority of this court elevates *Silva*'s 'unsupported by the record' standard to a much stricter '*contradicted* by the record' standard"].)

The rule set forth in *Reynoso*, which departed in essential respects from *Silva*, *Fuentes*, and *Hall*, effectively put this court on a glide path toward affirming unexplained trial court rulings denying *Batson* motions. As demonstrated by our repeated quotation and application of *Reynoso*'s rule in case after case, it has been easy for the court to find a prosecutor's stated reasons to be inherently plausible and either supported or not contradicted by the record, and then to defer to the trial court's ruling on that basis. (See, e.g., maj. opn., *ante*, at pp. 80, 87; *Williams*, *supra*, 56 Cal.4th at pp. 653–659; *People v. Vines* (2011) 51 Cal.4th 830, 849–

22

850; *People v. Watson* (2008) 43 Cal.4th 652, 670–673; *People v. Guerra* (2006) 37 Cal.4th 1067, 1103.)

**C.**

This court has never reconsidered *Reynoso* in light of the high court's decisions in *Miller-El* and *Snyder*, even though those authorities call into serious question our rule of deference to unexplained *Batson* rulings. Contrary to *Reynoso*, the high court in *Snyder* squarely held that a reviewing court may not accept a prosecutor's demeanor-based explanation for striking a minority juror in the absence of a trial court finding as to the juror's demeanor, at least where defense counsel has disputed the issue. (See *Snyder*, *supra*, 552 U.S. at p. 479 ["Rather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation. . . . [W]e cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous."].)

More broadly, *Miller-El* and *Snyder* elucidate by example the careful and thorough inquiry required at *Batson*'s third step, and those decisions make clear that the totality of circumstances relevant to evaluating the credibility of a prosecutor's stated reasons for striking a minority juror includes comparative juror analysis. (See *Snyder*, *supra*, 552 U.S. at pp. 479–485; *Miller-El*, *supra*, 545 U.S. at pp. 240–266.) Our precedent indulges the presumption that a trial court has conducted this rigorous inquiry, despite no indication in the record that it did, so long as the prosecutor's stated reason is inherently plausible and not contradicted by the record. However, by packing into a presumption the entire inquiry into "the plausibility of [the prosecutor's stated] reason in light of all evidence with a bearing on it" (*Miller-El*, *supra*, 545 U.S. at p. 252), we have "adopt[ed] a standard of appellate review that effectively insulates discriminatory strikes from meaningful scrutiny at both the trial and appellate stages." (*Reynoso*, *supra*, 31

23

Cal.4th p. 930 (dis. opn. of Kennard, J.).) Our rule of deference to summary *Batson* rulings all but assumes the answer to the question that *Batson* analysis is designed to address.

As today's opinion demonstrates, the application of this rule of deference tends to foster judicial rationalization of a prosecutor's strikes in a manner that *Batson* does not permit. It is all too tempting for a reviewing court, in speculating on the possible dynamics in the courtroom, to posit reasons in support of a trial court's *Batson* ruling that the prosecutor did not give. As noted, the court in this case relies on a four-word comment by M.H. to defense counsel ("are you misunderstanding me?") to suggest that the prosecutor may have struck M.H. because "her relative youth was a sign of immaturity," even though the prosecutor cited only M.H.'s youth, not her immaturity, as a reason for the strike. (Maj. opn., *ante*, at p. 83; see *ante*, at pp. 9–10.) And in *Reynoso*, the court reasoned that the fact that Elizabeth G. had "no prior jury experience" and "no prior contact with the criminal justice system" could support the sincerity of the prosecutor's strike, even though the prosecutor never mentioned those aspects of Elizabeth G.'s background in explaining the strike. (*Reynoso*, *supra*, 31 Cal.4th at p. 925.) These maneuvers violate the high court's admonition that adjudication of a *Batson* challenge "does not call for a mere exercise in thinking up any rational basis." (*Miller-El*, *supra*, 545 U.S. at p. 252.) A prosecutor's strike must "stand or fall on the plausibility of the reasons he gives," regardless of whether "a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." (*Ibid.*)

It is no doubt true that "a myriad of factors readily observable by those present in the courtroom, but not by those who are reviewing the case from a cold transcribed record on appeal," may properly inform a *Batson* ruling. (*Reynoso*, *supra*, 31 Cal.4th at p. 925.) For this reason, the trial court is in the best position to make the all-things-considered judgment required at *Batson*'s third stage.

24

When a trial court has conducted the requisite analysis and has articulated the findings that inform its *Batson* ruling, the principle of judicial restraint fully supports the application of deference on appeal. But when the "myriad of factors readily observable to those present in the courtroom" is simply left to judicial speculation on appeal, the application of deference does not reflect restraint at all. It is instead an active imagining of inquiries and analyses that may or may not have occurred. Like my colleagues, I am confident that our trial courts approach the evaluation of *Batson* claims with competence and sincerity. But jury selection can be a complex process, and in the context of a particular strike, a trial court may have "stopped taking notes" (*Williams*, *supra*, 56 Cal.4th at p. 651), it may have neglected to consult the record of voir dire (*id.* at p. 716 (dis. opn. of Liu, J.)), it "may not have recalled [a juror's] demeanor" (*Snyder*, *supra*, 552 U.S. at p. 479), it may have declined to engage in comparative juror analysis despite the urging of counsel (maj. opn., *ante*, at p. 79), it may have applied an erroneous legal standard in assessing a *Batson* claim (*Reynoso*, at pp. 933–934 (dis. opn. of Kennard, J.), or it may have made an unreasonable judgment under the totality of circumstances (*Miller-El*, *supra*, 545 U.S. at p. 266). Filling these gaps on appeal with speculation and presumptions is not an exercise of judicial restraint. It is also counterproductive. Our "don't ask, don't tell" approach to appellate review — whereby this court does not ask, when trial courts do not tell, the reasons for their *Batson* rulings — erodes the incentive for trial courts to articulate their findings and analysis, thereby heightening the frequency with which reviewing courts must resolve *Batson* claims on the basis of a paper record.

More fundamentally, in light of what decades of research have revealed about the stubborn role of race in jury selection (see *Harris*, *supra*, __ Cal.4th at pp. __–__ [at pp. 35–39] (conc. opn. of Liu, J.) [reviewing studies], it seems empirically suspect — if not downright unfair — to apply a rule of deference

whose practical effect is to hold that what a trial court leaves unsaid in denying a *Batson* claim will be construed on appeal in favor of the prosecution. The *Batson* inquiry ultimately focuses on the subjective genuineness of the prosecutor's stated reasons. It is a motive test, and short of a naked admission, it can be difficult to determine a person's motive with reasonable certainty. The law properly addresses this uncertainty by placing on the defendant the burden to prove it was more likely than not that the prosecutor's strike was motivated by race. The proof standard and the allocation of the burden to the defendant can be decisive in a close case, as I show below. (See *post*, at pp. 27–29.) But the law should not address the uncertainty by construing against the defendant all that we cannot know — because the trial court provided no findings or analysis — about what actually happened in the courtroom.

Our earlier precedent held trial courts to their obligation to make "a sincere and reasoned attempt to evaluate the prosecutor's explanation" (*Hall*, *supra*, 35 Cal.3d at p. 167) and underscored "the trial court's role in making an adequate record" by declaring that "[n]otwithstanding the deference we give to a trial court's determinations of credibility and sincerity, we can only do so when the court has clearly expressed its findings and rulings and the bases therefor" (*Fuentes*, *supra*, 54 Cal.3d at p. 716, fn. 5). Many trial courts do articulate the grounds for their *Batson* rulings, and it is entirely appropriate to make appellate deference contingent on this practice. For what is at issue is not some minor legal technicality, but a vital inquiry that implicates the most basic notions of fairness in our justice system. The United States Supreme Court has repeatedly emphasized the three-dimensional harm that results from racial discrimination in jury selection. The defendant is deprived of his "right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." (*Batson*, *supra*, 476 U.S. at pp. 85–86.) The excluded juror "suffers a profound personal

26

humiliation heightened by its public character" and loses "a significant opportunity to participate in civic life." (*Powers v. Ohio* (1991) 499 U.S. 400, 413–414, 409.) And "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." (*Batson*, at p. 87; see *Miller-El*, *supra*, 545 U.S. at p. 238 ["[T]he very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality,' [citation], and undermines public confidence in adjudication [citations]."]; *Powers*, at p. 412.) In light of these potential harms, it does not seem too much to insist that trial courts or, as a failsafe, reviewing courts demonstrate a truly reasoned effort to evaluate a defendant's assertion of this important right in light of all the circumstances bearing on it.

## III.

Because we cannot defer to the trial court's *Batson* ruling in this case, we must independently examine the record to determine whether defendant has shown that it was more likely than not that one or more of the prosecutor's strikes were motivated by race.

The record shows that the prosecutor struck all three black prospective jurors in the venire. This fact properly raises a suspicion but does not by itself prove discrimination. The significance of the pattern is attenuated in this case by the fact that the prosecutor gave credible reasons for striking two of the black jurors, P.F. and L.P. In her questionnaire and voir dire, P.F. consistently said she viewed the death penalty as an appropriate punishment for a person who has shown "a pattern" of violence or disregard for life. When the prosecutor asked P.F. if her focus on a pattern of behavior "wasn't something exclusive," she agreed. But P.F., when using her own words, did not voice support for the death

27

penalty in terms other than as punishment for "a pattern" of behavior, and no other seated or alternate juror expressed similar views. I thus conclude that the prosecutor's concern that P.F. had said "in her questionnaire [that the death penalty] was appropriate only where there was a pattern of violent conduct" was, in all likelihood, not pretextual. And I reach the same conclusion about the prosecutor's strike of L.P. based on his concerns that "[s]he is a social worker," a fact unique to L.P. as compared to the seated and alternate jurors, and that "she couldn't vote for the death penalty unless . . . the facts were proved beyond a shadow of a doubt," a natural understanding of L.P.'s remarks at voir dire.

Having found it improbable that the prosecutor struck P.F. or L.P. because of their race, I would examine the prosecutor's strike of M.H. without any suspicion arising from the fact that it occurred as part of an apparent pattern. Still, the strike appears suspicious because, as noted, the prosecutor's characterization of M.H.'s attitude regarding the death penalty as "personal and emotional, not philosophical" is a strained interpretation of what she said at voir dire, especially when considered in light of the views she indicated on her questionnaire. (*Ante*, at pp. 8–9.) Further, with respect to the prosecutor's concern that "she is young, single and no children," his claim that "no other jurors . . . fit that pattern" appears questionable in light of the fact that two seated jurors, Juror No. 1 and Juror No. 12, were single, childless, and close in age to M.H. (*Ante*, at pp. 10–11.) Juror No. 12's general views in favor of the death penalty were not very different from M.H.'s (*ante*, at pp. 11–12), and Juror No. 1 said on her questionnaire that the death penalty should be used "[o]nly in extreme cases," though during voir dire she said she had no particular case in mind and "it would depend on everything."

At the same time, comparative juror analysis reveals an important fact that supports the prosecutor's credibility. Besides M.H., three prospective jurors struck by the prosecutor were young, single, and without children: K.D. (age 28),

28

A.L. (age 20), and T.F. (age 33). In addition, all three indicated support for the death penalty. K.D. wrote on her questionnaire that the death penalty "should be imposed" in appropriate cases, and she said during voir dire that she would be able to follow the court's instructions and vote for death if the aggravating factors outweighed the mitigating factors. A.L. wrote that she had no strong "personal feelings about the law" and would "do what [she was] supposed to," and affirmed during voir dire that she could personally vote to impose the death penalty. T.F. stated that he believed the death penalty was the "appropriate and just punishment" in certain cases, and that he would "disagree" with the Legislature if it were to get rid of it. The fact that the prosecutor struck three other young, single, and childless pro-death penalty jurors lends credence to the prosecutor's statement, in explaining why he struck M.H., that "*primarily* the reason [is] she is young, single and no children" (italics added). By indicating that the prosecutor did not single out M.H. among all other prospective jurors possessing those characteristics, the prosecutor's strikes of K.D., A.L., and T.F. tend to diminish the inference of discrimination arising from the fact that the prosecutor did not also strike Juror No. 1 and Juror No.12, both of whom were slightly older than M.H.

Ultimately, the prosecutor's strikes of K.D., A.L., and T.F. make the possibility that he struck M.H. primarily because she was young, single, and without children at least as likely as the possibility that he struck M.H. because of her race. Based on an independent examination of the record, I conclude that defendant has not carried his burden of proving that it was more likely than not that the prosecutor struck M.H. because of her race. Accordingly, defendant's *Batson* claim must be rejected.

In all other respects, I join the court's opinion affirming the judgment.


LIU, J.

29

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mai

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S089478
**Date Filed:** August 26, 2013

_____

**Court:** Superior
**County:** Orange
**Judge:** Richard L. Weatherspoon

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and C. Delaine Renard, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

C. Delaine Renard
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Adrianne S. Denault
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92011
(619) 645-2287